Judge Hellerstein

07 CV 2622

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

INVESCO INSTITUTIONAL (N.A.), INC.,

Plaintiff,

v.

DEUTSCHE INVESTMENT MANAGEMENT
AMERICAS INC.

Defendant.

Civil Action No._____



COMPLAINT

RECEIVED
MAR 29 2007
JURY TRIAL DEMANDED V.
CASHIERS

The Plaintiff, INVESCO Institutional (N.A.), Inc. ("INVESCO"), by and

through its undersigned attorneys, hereby sets forth its Complaint against Defendant

Deutsche Investment Management Americas Inc. ("Deutsche") as follows:

THE PARTIES, JURISDICTION AND VENUE

1.      INVESCO is a global financial services firm.  INVESCO is ultimately

owned by AMVESCAP PLC ("AMVESCAP").  The Worldwide Fixed Income Group

("WFI"), formerly referred to from time to time as the INVESCO Fixed Income/Stable

Value Division, is an operating group within AMVESCAP focused upon the management

of fixed income investments with many of the group's members employed by INVESCO.

INVESCO has operations in the metropolitan Louisville, Kentucky, area.  INVESCO is

incorporated under the laws of the State of Delaware, and maintains its principal place of

business in the State of Georgia.

2.      Defendant Deutsche Investment Management Americas Inc. is incorporated under the laws of the State of Delaware and maintains its principal place of business in New York, New York.

3.      This Court has jurisdiction over the subject matter of this action pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 because this case arises under the Trademark Act of 1946, 15 U.S.C. §§ 1051, et seq. (the "Lanham Act").

4.      This Court has jurisdiction over INVESCO's state law claims pursuant to 28 U.S.C. § 1367 and the doctrine of supplemental jurisdiction.

5.      This Court has personal jurisdiction over Deutsche because it maintains its principal place of business in this judicial district.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Deutsche resides in this district.

## THE WRONGFUL ACTS OF DEFENDANT

7.      Stephen M. Johnson ("Johnson"), James F. Guenther ("Guenther"), Kenneth R. Bowling ("Bowling"), and Randy G. Paas ("Paas") were, as of March 23, 2007, long-standing employees of INVESCO working in its WFI group in Louisville. That group includes approximately 155 employees, approximately 86 of whom are investment professionals. Johnson, Guenther, Bowling and Paas achieved the designation of Global Partner. Such status is reserved for select employees who have demonstrated exceptional ability and have made a substantial or unique contribution to INVESCO's business. Global Partners at INVESCO are senior executives, and attaining

the status of Global Partner is a very significant achievement. Of all the employees in the INVESCO WFI group in Louisville, only six were Global Partners as of March 23, 2007.

8.      Johnson, Guenther, Bowling and Paas (collectively, the "WFI Global Partners") each signed a Global Partner Agreement ("GP Agreement"). True and correct copies of such agreements are attached (Johnson at Exhibit "A," Guenther at Exhibit "B," Bowling at Exhibit "C," and Paas at Exhibit "D"). Each of these agreements were renewed earlier this year for the 2007 calendar year, and each of the WFI Global Partners was thus under contract with INVESCO as of March 23, 2007. In their GP Agreements, the WFI Global Partners promised, among other things, that they would provide twelve months advance written notice of any termination of their GP Agreement. In fact, each Global Partner Defendant was permitted to choose his respective notice period within the range of four to twelve months, and each elected a twelve month notice period. In addition to the notice provision of the GP Agreements, such agreements also contain provisions regarding confidentiality of company information, non-solicitation of customers, and non-pirating of company employees.

9.      During each year of their recent employment at INVESCO, each of the WFI Global Partners has received substantial compensation exceeding hundreds of thousands of dollars. In addition to salary and bonus, the WFI Global Partners have also been rewarded with stock options and restricted stock awards, as well as generous benefits.

10.      In addition to cash and other compensation, each of the WFI Global Partners has also been permitted access to confidential and trade secret information of

INVESCO to be used for the sole and exclusive purpose of benefiting the business. This confidential and trade secret information includes, but is not limited to, information about proprietary software applications, customer lists, customer preferences, investment holdings and amounts, pricing and fee lists, employee compensation information, and business strategies and plans of the company.

11.     Over a period of months prior to March 23, 2007, each of the WFI Global Partners carried on secret discussions with Deutsche regarding leaving employment at INVESCO and becoming employed at Deutsche. Upon information and belief, Deutsche has been scheming with the WFI Global Partners for many months – even as the WFI Global Partners' agreements were renewing – in an effort to raid illegally WFI's business. The discussions contemplated the WFI Global Partners exiting on short notice and in complete disregard and violation of the WFI Global Partners' obligations, including their 12-month notice obligations, under the GP Agreements.

12.     Deutsche retained a professional recruiting firm, Russell Reynolds Associates ("Russell Reynolds"), to assist in executing its unlawful scheme. Upon information and belief, because the WFI Global Partners were subject to non-solicitation agreements Deutsche deployed Russell Reynolds to contact other INVESCO professionals whom the WFI Global Partners were interested in bringing over with them to Deutsche. Upon information and belief, Russell Reynolds contacted INVESCO employees identified by Deutsche, in an effort to mask the WFI Global Partners' breaches of their GP Agreements and other legal duties, as well as Deutsche's inducement of those breaches. Many of the employees Russell Reynolds contacted have

now resigned from INVESCO and indicated they intend to commence employment with Deutsche.

13.    Deutsche revealed its plan to hire away substantially all of INVESCO's WFI core personnel in a meeting held on March 23, 2007. On that date, Kevin Parker, Deutsche's Head of Asset Management, appeared and met with the Chief Executive Officer of AMVESCAP, Martin Flanagan, at Mr. Flanagan's office. At that time, Parker indicated that, on Monday and Tuesday of the following week, INVESCO would receive a series of resignations of key WFI group personnel, including the WFI Global Partners, and that, after the resignations were concluded, there would be virtually nothing left of the operation. Mr. Parker further indicated that Deutsche's raid was a fait accompli and INVESCO should simply accept this reality. In fact, Mr. Parker delivered to Mr. Flanagan a proposed Memorandum of Understanding (the "Memorandum") and insisted that Mr. Flanagan review and execute the document. According to the Memorandum, a true and correct copy of which is attached as Exhibit "E," INVESCO was to assist in an orderly transition of the business to Deutsche in exchange for some unspecified compensation. The Memorandum, if executed, would also release all claims in relation to the employee raid, and would specifically waive the applicable twelve-month notice provisions of the GP Agreements entered into by the WFI Global Partners.

14.    The intentions of Parker and others at Deutsche became even more evident in short order. By email dated March 25, 2007, Parker again contacted Mr. Flanagan. A true and correct copy of the referenced email is attached as Exhibit "F." In the email, Parker reminds Mr. Flanagan that INVESCO's WFI team "will be resigning on Monday afternoon and the chance of changing their minds at that point was remote." Parker goes

on to "impress upon" Mr. Flanagan "the point that the <u>resignation of so many of the key</u> <u>members of your staff would undoubtedly result in near total asset loss for investco (sic)</u>" (emphasis supplied).

15.    Thus, Deutsche, by verbal and written word of Mr. Parker, advised INVESCO that it has interfered with the contractual obligations and fiduciary duties owed by the WFI Global Partners to INVESCO.

16.    Notwithstanding Mr. Parker's threatening communications, Mr. Flanagan and INVESCO refused to sign the Memorandum and refused to permit the WFI Global Partners to thumb their noses at their contractual notice obligations.

17.    On March 26, 2007, Deutsche set its scheme in motion.  Having learned that INVESCO would not capitulate to its demands, Deutsche caused the four WFI Global Partners to deliver essentially identical resignation letters to INVESCO.  In the resignation letters, each of the WFI Global Partners represented that he would honor the GP Agreement's one year notice provision.

18.    On that same date, Deutsche issued a press release designed to mislead INVESCO's clients into believing that it had already hired away the four WFI Global Partners and that their arrival at Deutsche was imminent.  A true and correct copy of the press release is attached as Exhibit "G."  The heading of the press release touted: "DEUTSCHE ASSET MANAGEMENT ANNOUNCES MAJOR EXPANSION OF ITS GLOBAL INSTITUTIONAL FIXED INCOME INVESTMENT TEAM."  The body of the release opened with the sentence that Deutsche "today announced a major expansion of its Institutional Fixed Income Investment team."  Misleadingly using the present tense,

the press release quoted Mr. Parker as claiming that "[t]his is a significant expansion to our Global and U.S. Institutional Fixed Income Investment team" (emphasis supplied).

19.    Building on the effort to create the impression that the hiring of the four WFI Global Partners was a fait accompli, the release went on to claim that "four senior investment managers . . . will join [Deutsche] from INVESCO," without acknowledging that each of these individuals had submitted letters in which they represented that they would remain at INVESCO for another full year.  In fact, nowhere in the press release did Deutsche disclose that the WFI Global Partners, who were identified by name in the body of the release, could not start work at Deutsche under their GP Agreements for a full year.

20.    In an effort to further obfuscate the truth, Deutsche issued a second deceptive press release the following day, March 27, 2007.  A true and correct copy of the press release is attached as Exhibit "H."  In that press release, Deutsche trumpeted that a London-based INVESCO employee, Mark Dowding, "will join Deutsche Bank's Asset Management division."  By describing a role at Deutsche Bank and identifying an individual to whom he supposedly will report, Deutsche sought to convey the false impression that Dowding's arrival at Deutsche was imminent when, in fact, Dowding has committed to working at INVESCO through the term of his four-month notice period.

21.    On March 27, 2007, INVESCO terminated the employment of Randy Paas for cause and commenced litigation against him in the United States District Court for the Western District of Kentucky.  The other three GWI Global Partners remain employed by INVESCO, although INVESCO has placed each of them on paid leaves of absence and added them as defendants in the previously commenced litigation against Mr. Paas.  On

March 28, 2007, the three GWI Global Partners who remain employed by INVESCO

commenced litigation against INVESCO's corporate affiliate, AMVESCAP, in Kentucky

state court. AMVESCAP has removed that litigation to the United States District Court

for the Western District of Kentucky, where its previously filed action against the GWI

Global Partners is pending.

Count One – Tortious Interference

22.    INVESCO incorporates by reference the provisions of paragraphs 1

through 21, above, as if fully set forth herein.

23.    Deutsche has tortiously interfered with contractual and employment

relationships of INVESCO. With full and complete knowledge of the notice as well as

the other provisions of the GP Agreements, Deutsche has nonetheless maliciously

induced or tempted to induce the WFI Global Partners to breach their GP Agreements

and thereby cause harm to INVESCO. By way of further example, Deutsche has also

maliciously induced or attempted to induce the WFI Global Partners to breach the

confidentiality, nonsolicitation and anti-pirating portions of their Global Partner

agreements, in addition to other portions of said agreements. The wrongful actions of

Deutsche have both caused breaches of the GP Agreements by the WFI Global Partners,

as well as made performance under the GP Agreements by the WFI Global Partner

partners more difficult.

24.    As a direct and proximate result of the tortious conduct of Deutsche,

INVESCO has sustained and will incur further damages in an amount to be proven at

trial. INVESCO has suffered and will continue to suffer immediate and irreparable harm,

and will continue to suffer such injury until the tortious conduct of Deutsche is preliminarily and permanently enjoined.

### Count Two – Aiding and Abetting Breaches of Fiduciary Duties

25.    INVESCO incorporates paragraphs 1 through 24, above, as if fully set forth herein.

26.    The WFI Global Partners each owed fiduciary duties to INVESCO, including duties of loyalty, candor, disclosure and diligence.  The WFI Global Partners specifically acknowledged the existence of these fiduciary duties in their GP Agreements with INVESCO.

27.    By virtue of the above-described and other actions, the WFI Global Partners breached their fiduciary duties to INVESCO by, among other things, competing and preparing to compete with INVESCO; using INVESCO's facilities, resources, time and confidential information to compete and/or prepare to compete; by using INVESCO's business records and confidential information for their personal benefit; and by otherwise usurping and misappropriating opportunities and resources belonging to INVESCO, all the time while under contract with INVESCO.

28.    By virtue of its above-described and other actions, Deutsche has actively aided and abetted the WFI Global Partners' breaches of fiduciary law duties, thereby rendering Deutsche liable for compensatory and punitive damages.

29.    As a direct and proximate result of the tortious conduct of Deutsche, INVESCO has sustained and will incur further damages in an amount to be proven at

trial.  INVESCO has suffered and will continue to suffer immediate and irreparable harm, and will continue to suffer such injury until the tortious conduct of Deutsche is preliminarily and permanently enjoined.

Count Three – Misappropriation of Trade Secrets

30.     INVESCO incorporates by reference the provisions of paragraphs 1 through 29, above, as if fully set forth herein.

31.     During their employment with INVESCO, the WFI Global Partners were given access to INVESCO's trade secrets and confidential and proprietary information, as described above.

32.     This trade secret and confidential and proprietary information provided INVESCO with a competitive advantage over other companies in the same field.

33.     Deutsche knowingly engaged in a conspiracy to and, upon information and belief, did unlawfully obtain trade secret and/or confidential and proprietary information of INVESCO from the WFI Global Partners.

34.     By virtue of its above-described and other actions, upon information and belief, Deutsche misappropriated INVESCO's trade secrets and/or confidential and proprietary information to plan and launch its unlawful scheme to raid INVESCO and ruin its business.

35.     As a direct and proximate result of the tortious conduct of Deutsche, INVESCO has sustained and will incur further damages in an amount to be proven at

trial. INVESCO has suffered and will continue to suffer immediate and irreparable harm, and will continue to suffer such injury until the tortious conduct of Deutsche is preliminarily and permanently enjoined.

Count Four – Unfair Competition

36.     INVESCO incorporates by reference paragraphs 1 through 35, above, as if fully set forth herein.

37.     Deutsche knowingly engaged in a conspiracy to and, upon information and belief, did illegally obtain trade secrets and/or confidential and proprietary information and materials of INVESCO from the WFI Global Partners.

38.     By virtue of its above-described and other actions, Deutsche engaged in unfair competition in attempting to obtain and, upon information and belief, obtaining INVESCO's trade secrets and confidential/proprietary information, unlawfully using that information to devise and launch a full-scale raid on INVESCO's business, and in attempting to destroy that business through unlawful means.

39.     In furtherance of its illegal scheme, Deutsche has undertaken a course of action to specifically target and extract from INVESCO a quantum and quality of personnel which, if successfully removed, would threaten to severely cripple the WFI group at INVESCO as predicted in the Parker email message described above and attached as Exhibit "F."

40.     As a direct and proximate result of the tortious conduct of Deutsche, INVESCO has sustained and will incur further damages in an amount to be proven at

trial. INVESCO has suffered and will continue to suffer immediate and irreparable harm, and will continue to suffer such injury until the tortious conduct of Deutsche is preliminarily and permanently enjoined.

Count Five – Lanham Act

41.     INVESCO incorporates by reference paragraphs 1 through 40, above, as if fully set forth herein.

42.     As described in detail above, Deutsche's press releases announcing the hiring of the GWI Partners and Dowding contain literally false statements and/or statements that, while literally true, are implicitly false or misleading. Such statements, which were used in advertising or promotion in commerce, misrepresent characteristics, capabilities, and qualities of the services and commercial activities of both Deutsche and INVESCO.

43.     Deutsche's press releases therefore mislead and harm customers and consumers, as well as damage INVESCO's good name and reputation in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

44.     The aforesaid acts were undertaken willfully and deliberately and with the intention of causing confusion, mistake or deception.

45.     As a direct and proximate result of the aforesaid acts of Deutsche, INVESCO has sustained and will incur further damages in an amount to be proven at trial, as well as attorneys' fees and costs. INVESCO has suffered and will continue to

suffer immediate and irreparable harm, and will continue to suffer such injury until the tortious conduct of Deutsche is preliminarily and permanently enjoined.

WHEREFORE, having set forth its Complaint above, Plaintiff INVESCO Institutional (N.A.), Inc. demands that judgment be entered against Defendant Deutsche Investment Management Americas Inc. as follows:

(A)    on Count One, damages in a precise amount to be determined at trial, together with preliminary and permanent injunctive relief from defendant's tortious interference;

(B)    on Count Two, damages in a precise amount to be determined at trial, together with preliminary and permanent injunctive relief from defendant's aiding and abetting breaches of fiduciary duties;

(C)    on Count Three, damages in a precise amount to be determined at trial, together with preliminary and permanent injunctive relief from defendant's misappropriation of trade secrets;

(D)    on Count Four, damages in a precise amount to be determined at trial, together with preliminary and permanent injunctive relief from defendant's unfair competition;

(E)    on Count Five, damages in a precise amount to be determined at trial, together with preliminary and permanent injunctive relief from defendant's Lanham Act violations;

(F)     attorneys' fees and costs in a precise amount to be determined at trial; and

(G)     such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff INVESCO Institutional (N.A.), Inc. demands a trial by jury.


Dated:  New York, New York
        March 29, 2007


                                        ALSTON & BIRD LLP

                                        By: _____
                                        John F. Cambria (JC 4098
                                        Michael E. Johnson (MJ 0299)
                                        90 Park Avenue
                                        New York, NY 10016-1387
                                        212-210-9400


                                        *Attorneys for Plaintiff*
                                        *INVESCO Institutional (N.A.), Inc.*


Of Counsel:

Robert P. Riordan
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA  30309-3424
Phone:  (404) 881-7000

Exhibit A

 INVESCO

### Global Partner Agreement
### Stephen M. Johnson

INVESCO Fixed Income/Stable Value Division (the "Company"), part of the AMVESCAP Group, wishes to employ you as a Global Partner under the terms and conditions set forth in this letter. The term "Global Partner" is used throughout the AMVESCAP Group to refer to the most senior group of officers and employees. The purpose of this letter is to articulate the terms and conditions of your employment. [This letter agreement also extinguishes and replaces your previous Global Partner Agreement.]

It is important to note at the outset that both the Company and AMVESCAP Group consider you an important part of its continued success. Further, please note that under the terms of this letter agreement, which is a binding contract, neither the Company nor you has any right to terminate the employment relationship except as set forth below.

### 1. Duties Of Employment

You agree to perform the duties assigned to you by the Company as more specifically stated in an attachment to this letter. The attachment may be modified in the future if you and the Company agree in writing. You understand and agree that during your employment relationship with the Company, you are not allowed, without proper prior approval, to perform any business activities for any person or entity other than the Company or another company that is part of the AMVESCAP Group. Of course, if you obtain the Company's prior written approval, you may perform other business activities.

It is your obligation to comply with all Company policies and procedures, including those set forth in any Code of Ethics and other materials distributed by the Company to its employees. Further, you agree to comply with all applicable rules and regulations that pertain to the Company's business.

As a Global Partner you have important duties to the Company: the duty to refrain from dealing in your self interest above that of the Company's, the duty to disclose any information that indicates that you may be exposed to a conflict of interests, the duty of loyalty, and the duty to refrain from using the Company's business opportunities for your own benefit. These fiduciary obligations and others arise because of the unique trust and confidence the Company places in you as a Global Partner.

 INVESCO

### 2. Compensation

Your annual salary is set forth in an attachment to this letter. You will also receive certain bonuses and stock awards as approved from time to time by the Company.   The attachment may be modified in the future as agreed by you and the Company in writing.

### 3. Term

The term of your employment relationship with the Company shall be for one year from the date of your signature on this letter. This term will automatically renew at the end of the initial term for another year and will continue to renew every year, unless your employment is terminated in a manner specified below,.   In no event will the term of your employment relationship with the Company be less than the unexpired period of any notice of intent to terminate given as set forth below. Your employment can only be terminated as specifically set forth below.

#### A. Termination Effective After Expiration of Notice Period

Either you or the Company may terminate the employment relationship at any time during the initial term or any renewal, upon _12_ (see Note) months written notice to the other party.  Notice of intent to terminate will be considered given upon mailing or actual receipt, whichever occurs first.   Whether you or the Company give the notice of termination, your employment will continue for the entire notice period.  The effective date of the termination of the employment relationship will be the last day of the notice period.

[*Note*: The Company is willing to agree to a minimum four month notice period, but will accept up to twelve months as a reasonable notice period. Please fill in and initial the notice period that you desire. If you do not designate a number of months in the blank or if you designate a number less than four months, you are agreeing to the default notice period of four months.]

#### B.  Termination by Mutual Agreement

You and the Company can, effective immediately, terminate the employment relationship without cause or notice, but such a mutual termination will only be effective if you and the Company both agree to the termination in writing.  Such an agreement must be signed by the Chief Executive Officer of the Company to be effective.

#### C.  Termination with Cause

Your employment may be terminated effective immediately upon written notice if the Company believes in good faith that you engaged in the following conduct:

(1)   After written notice, any continuing violation of this agreement or Company policies or procedures;

(2)   Your conviction of committing a criminal act;

 INVESCO

(3)   Any violation of law or regulation related to the business of the Company or affecting your ability to perform your duties;

(4)   Your bankruptcy or insolvency.

You may terminate your employment effective immediately if the Company, after written notice, has engaged in any continuing violation of this letter agreement and has not cured such violation within a reasonable period of time.

### D. Termination Due to Death or Disability

In the event of your death, or disability to the extent that you cannot perform the essential functions of your position with reasonable accommodation, your employment will be terminated effective on the last day of the month that such death or disability occurs. We mutually recognize that the Company has a disability plan that is separate from this letter agreement.

### 4. Confidential Information

A critical aspect of your position is your access to trade secret, proprietary, and confidential information. For example, your knowledge of the exact amounts and holdings of Company-related investment positions is confidential. While some of that information may eventually be made public, the information is extremely sensitive and is to be treated as confidential until it is released. Likewise, computer models and programs developed by the Company or purchased by it are proprietary and confidential. Other information the Company possesses as trade secrets or confidential information include its marketing strategies, marketing plans, compensation arrangements, benefit plans, and ideas and inventions of its employees.

These are simply examples of the types of information the Company considers trade secret and/or confidential. As time passes, the Company will no doubt develop new categories of information it considers trade secret and/or confidential. As this occurs, the Company will identify such new categories of information and remind you of your obligation to treat it as confidential. The importance of all of the types of information identified here is that the Company's competitors do not have permitted access to this information and are thus unable to use it to compete with the Company. Accordingly, these types of information create a competitive advantage for the Company and are economically valuable. Thus, you agree not to disclose or use any of the Company's trade secret and/or confidential information for your own benefit or the benefit of anyone other than the Company, during your employment or for six (6) months after the effective date of the termination of your employment relationship with the Company.

### 5. Company Employees And Customers

You agree that, in the event of the termination of the employment relationship between you and the Company, you will not solicit or hire any Company employees for a period of six (6) months after the effective date of the termination of your employment relationship with the Company. Further, you agree that you will not solicit the business relationships you developed or acquired while working for the Company or another company affiliated with the AMVESCAP

 INVESCO

Group for a period of six (6) months after the effective date of the termination of your employment.

### 6. Inventions And Ideas

Since the Company is paying you for your time and efforts, you agree that all information, ideas, and inventions you develop while employed by the Company related in any way to the Company's business, are the sole property of the Company. This includes all investment models, processes, and methodologies you develop while employed by the Company. Indeed, one of the reasons for your employment is the creation of such ideas. This information is confidential and trade secret information as discussed above. You understand that the Company may seek to patent or to obtain trademark or copyright protection related to such information, ideas, and inventions, and that, if necessary, you will assign any interest you may have in such information, ideas, and inventions you develop to the Company.

### 7. Return of Company Property

Upon the termination of your employment, you agree to return all property of the Company. To the extent such property is information of which you have detailed knowledge but no electronic or other documents containing such information, you agree to itemize such information in writing for the Company prior to the effective date of the termination of your employment.

### 8. Assignment

You agree that this letter agreement may be assigned to any other entities in the AMVESCAP Group, or to any successor company by acquisition of either the Company's stock or its assets. In the case of such an assignment by the Company, you understand and agree that you would continue to be bound by this letter agreement. No such assignment, without your consent, shall require you to change your duties or to move from your principal residence.

### 9. Choice of Law and Forum

We agree that, in the event of a disagreement between you and the Company about any aspect of your employment with the Company or this letter agreement, Kentucky substantive law, without regard to Kentucky's choice of law rules, will govern any litigation or proceeding brought by either party. You also agree that any litigation or proceeding shall be brought in Jefferson County, Kentucky, in either state or federal court, as appropriate.

### 10. Notice

We agree that any notice that is to be given under this letter agreement is properly given when delivered in person, by certified mail, or by over night delivery such as Federal Express.

 INVESCO

### 11.   Prior Agreements

This letter agreement extinguishes and replaces any previous written employment agreement between you and the Company.

We are very grateful for the significant contributions you are making to the Company and look forward to working with you in the future.

INVESCO Fixed Income/
Stable Value Division

By: _____
A. George Baumann, President

Accepted ___1/12/01___
                  Date

_____
Stephen M. Johnson

- 5 -

*Global Partner Contract Attachment*

Name:          **Stephen M. Johnson**
               **Chief Investment Officer**

Date of Hire:   **May 28, 1991**

*Statement of Responsibilities*

Fixed Income Chief Investment Dealer.

Base Compensation Effective January 1, 2001 $250,000.00

Exhibit B

 INVESCO

## Global Partner Agreement
## James F. Guenther

INVESCO Fixed Income/Stable Value Division (the "Company"), part of the AMVESCAP Group, wishes to employ you as a Global Partner under the terms and conditions set forth in this letter. The term "Global Partner" is used throughout the AMVESCAP Group to refer to the most senior group of officers and employees. The purpose of this letter is to articulate the terms and conditions of your employment. [This letter agreement also extinguishes and replaces your previous Global Partner Agreement.]

It is important to note at the outset that both the Company and AMVESCAP Group consider you an important part of its continued success. Further, please note that under the terms of this letter agreement, which is a binding contract, neither the Company nor you has any right to terminate the employment relationship except as set forth below.

### 1. Duties Of Employment

You agree to perform the duties assigned to you by the Company as more specifically stated in an attachment to this letter. The attachment may be modified in the future if you and the Company agree in writing. You understand and agree that during your employment relationship with the Company, you are not allowed, without proper prior approval, to perform any business activities for any person or entity other than the Company or another company that is part of the AMVESCAP Group. Of course, if you obtain the Company's prior written approval, you may perform other business activities.

It is your obligation to comply with all Company policies and procedures, including those set forth in any Code of Ethics and other materials distributed by the Company to its employees. Further, you agree to comply with all applicable rules and regulations that pertain to the Company's business.

As a Global Partner you have important duties to the Company: the duty to refrain from dealing in your self interest above that of the Company's, the duty to disclose any information that indicates that you may be exposed to a conflict of interests, the duty of loyalty, and the duty to refrain from using the Company's business opportunities for your own benefit. These fiduciary obligations and others arise because of the unique trust and confidence the Company places in you as a Global Partner.

 INVESCO

### 2. Compensation

Your annual salary is set forth in an attachment to this letter. You will also receive certain bonuses and stock awards as approved from time to time by the Company. The attachment may be modified in the future as agreed by you and the Company in writing.

### 3. Term

The term of your employment relationship with the Company shall be for one year from the date of your signature on this letter. This term will automatically renew at the end of the initial term for another year and will continue to renew every year, unless your employment is terminated in a manner specified below,. In no event will the term of your employment relationship with the Company be less than the unexpired period of any notice of intent to terminate given as set forth below. Your employment can only be terminated as specifically set forth below.

#### A. Termination Effective After Expiration of Notice Period

Either you or the Company may terminate the employment relationship at any time during the initial term or any renewal, upon **12** * (see Note) months written notice to the other party. Notice of intent to terminate will be considered given upon mailing or actual receipt, whichever occurs first. Whether you or the Company give the notice of termination, your employment will continue for the entire notice period. The effective date of the termination of the employment relationship will be the last day of the notice period.

[*Note*: The Company is willing to agree to a minimum four month notice period, but will accept up to twelve months as a reasonable notice period. Please fill in and initial the notice period that you desire. If you do not designate a number of months in the blank or if you designate a number less than four months, you are agreeing to the default notice period of four months.]

#### B. Termination by Mutual Agreement

You and the Company can, effective immediately, terminate the employment relationship without cause or notice, but such a mutual termination will only be effective if you and the Company both agree to the termination in writing. Such an agreement must be signed by the Chief Executive Officer of the Company to be effective.

#### C. Termination with Cause

Your employment may be terminated effective immediately upon written notice if the Company believes in good faith that you engaged in the following conduct:

(1) After written notice, any continuing violation of this agreement or Company policies or procedures;

(2) Your conviction of committing a criminal act;

 INVESCO

(3)   Any violation of law or regulation related to the business of the Company or affecting your ability to perform your duties;

(4)   Your bankruptcy or insolvency.

You may terminate your employment effective immediately if the Company, after written notice, has engaged in any continuing violation of this letter agreement and has not cured such violation within a reasonable period of time.

### D. Termination Due to Death or Disability

In the event of your death, or disability to the extent that you cannot perform the essential functions of your position with reasonable accommodation, your employment will be terminated effective on the last day of the month that such death or disability occurs. We mutually recognize that the Company has a disability plan that is separate from this letter agreement.

### 4. Confidential Information

A critical aspect of your position is your access to trade secret, proprietary, and confidential information. For example, your knowledge of the exact amounts and holdings of Company-related investment positions is confidential. While some of that information may eventually be made public, the information is extremely sensitive and is to be treated as confidential until it is released. Likewise, computer models and programs developed by the Company or purchased by it are proprietary and confidential. Other information the Company possesses as trade secrets or confidential information include its marketing strategies, marketing plans, compensation arrangements, benefit plans, and ideas and inventions of its employees.

These are simply examples of the types of information the Company considers trade secret and/or confidential. As time passes, the Company will no doubt develop new categories of information it considers trade secret and/or confidential. As this occurs, the Company will identify such new categories of information and remind you of your obligation to treat it as confidential. The importance of all of the types of information identified here is that the Company's competitors do not have permitted access to this information and are thus unable to use it to compete with the Company. Accordingly, these types of information create a competitive advantage for the Company and are economically valuable. Thus, you agree not to disclose or use any of the Company's trade secret and/or confidential information for your own benefit or the benefit of anyone other than the Company, during your employment or for six (6) months after the effective date of the termination of your employment relationship with the Company.

### 5. Company Employees And Customers

You agree that, in the event of the termination of the employment relationship between you and the Company, you will not solicit or hire any Company employees for a period of six (6) months after the effective date of the termination of your employment relationship with the Company. Further, you agree that you will not solicit the business relationships you developed or acquired while working for the Company or another company affiliated with the AMVESCAP

 INVESCO

Group for a period of six (6) months after the effective date of the termination of your employment.

### 6. Inventions And Ideas

Since the Company is paying you for your time and efforts, you agree that all information, ideas, and inventions you develop while employed by the Company related in any way to the Company's business, are the sole property of the Company. This includes all investment models, processes, and methodologies you develop while employed by the Company. Indeed, one of the reasons for your employment is the creation of such ideas. This information is confidential and trade secret information as discussed above. You understand that the Company may seek to patent or to obtain trademark or copyright protection related to such information, ideas, and inventions, and that, if necessary, you will assign any interest you may have in such information, ideas, and inventions you develop to the Company.

### 7. Return of Company Property

Upon the termination of your employment, you agree to return all property of the Company. To the extent such property is information of which you have detailed knowledge but no electronic or other documents containing such information, you agree to itemize such information in writing for the Company prior to the effective date of the termination of your employment.

### 8. Assignment

You agree that this letter agreement may be assigned to any other entities in the AMVESCAP Group, or to any successor company by acquisition of either the Company's stock or its assets. In the case of such an assignment by the Company, you understand and agree that you would continue to be bound by this letter agreement. No such assignment, without your consent, shall require you to change your duties or to move from your principal residence.

### 9. Choice of Law and Forum

We agree that, in the event of a disagreement between you and the Company about any aspect of your employment with the Company or this letter agreement, Kentucky substantive law, without regard to Kentucky's choice of law rules, will govern any litigation or proceeding brought by either party. You also agree that any litigation or proceeding shall be brought in Jefferson County, Kentucky, in either state or federal court, as appropriate.

### 10. Notice

We agree that any notice that is to be given under this letter agreement is properly given when delivered in person, by certified mail, or by over night delivery such as Federal Express.

 INVESCO

## 11.  Prior Agreements

This letter agreement extinguishes and replaces any previous written employment agreement between you and the Company.

We are very grateful for the significant contributions you are making to the Company and look forward to working with you in the future.

**INVESCO Fixed Income/
Stable Value Division**

By:  _____
A. George Bahmann, President

Accepted  _1/11/01_____
                {Date}

_____
        James F. Guenther

***Global Partner Contract Attachment***

Name:          **James F. Guenther**
               **Director of Research**

Date of Hire:  **May 13, 1992**

*Statement of Responsibilities*

Oversight and direction of fixed income credit research team/process

Base Compensation Effective January 1, 2001   #184,000.00

Exhibit C

 INVESCO

## Global Partner Agreement
### Kenneth R. Bowling

INVESCO Fixed Income/Stable Value Division (the "Company"), part of the AMVESCAP Group, wishes to employ you as a Global Partner under the terms and conditions set forth in this letter. The term "Global Partner" is used throughout the AMVESCAP Group to refer to the most senior group of officers and employees. The purpose of this letter is to articulate the terms and conditions of your employment.

It is important to note at the outset that both the Company and AMVESCAP Group consider you an important part of its continued success. Further, please note that under the terms of this letter agreement, which is a binding contract, neither the Company nor you has any right to terminate the employment relationship except as set forth below.

### 1. Duties Of Employment

You agree to perform the duties assigned to you by the Company as more specifically stated in an attachment to this letter. The attachment may be modified in the future if you and the Company agree in writing. You understand and agree that during your employment relationship with the Company, you are not allowed, without proper prior approval, to perform any business activities for any person or entity other than the Company or another company that is part of the AMVESCAP Group. Of course, if you obtain the Company's prior written approval, you may perform other business activities.

It is your obligation to comply with all Company policies and procedures, including those set forth in any Code of Ethics and other materials distributed by the Company to its employees. Further, you agree to comply with all applicable rules and regulations that pertain to the Company's business.

As a Global Partner you have important duties to the Company: the duty to refrain from dealing in your self interest above that of the Company's, the duty to disclose any information that indicates that you may be exposed to a conflict of interests, the duty of loyalty, and the duty to refrain from using the Company's business opportunities for your own benefit. These fiduciary obligations and others arise because of the unique trust and confidence the Company places in you as a Global Partner.

 INVESCO

### 2. Compensation

Your annual salary is set forth in an attachment to this letter. You will also receive certain bonuses and stock awards as approved from time to time by the Company.    The attachment may be modified in the future as agreed by you and the Company in writing.

### 3. Term

The term of your employment relationship with the Company shall be for one year from the date of your signature on this letter. This term will automatically renew at the end of the initial term for another year and will continue to renew every year, unless your employment is terminated in a manner specified below,.  In no event will the term of your employment relationship with the Company be less than the unexpired period of any notice of intent to terminate given as set forth below. Your employment can only be terminated as specifically set forth below.

### A. Termination Effective After Expiration of Notice Period

Either you or the Company may terminate the employment relationship at any time during the initial term or any renewal, upon **12** * (see Note) months written notice to the other party.  Notice of intent to terminate will be considered given upon mailing or actual receipt, whichever occurs first.   Whether you or the Company give the notice of termination, your employment will continue for the entire notice period.  The effective date of the termination of the employment relationship will be the last day of the notice period.

[*Note*: The Company is willing to agree to a minimum four month notice period, but will accept up to twelve months as a reasonable notice period.  Please fill in and initial the notice period that you desire. If you do not designate a number of months in the blank or if you designate a number less than four months, you are agreeing to the default notice period of four months.]

### B. Termination by Mutual Agreement

You and the Company can, effective immediately, terminate the employment relationship without cause or notice, but such a mutual termination will only be effective if  you and the Company both agree to the termination in writing.  Such an agreement must be signed by the Chief Executive Officer of the Company to be effective.

### C. Termination with Cause

Your employment may be terminated effective immediately upon written notice if the Company believes in good faith that you engaged in the following conduct:

(1)    After written notice, any continuing violation of this agreement or Company policies or procedures;
(2)    Your conviction of committing a criminal act;

 INVESCO

(3)    Any violation of law or regulation related to the business of the Company or affecting your ability to perform your duties;

(4)    Your bankruptcy or insolvency.

You may terminate your employment effective immediately if the Company, after written notice, has engaged in any continuing violation of this letter agreement and has not cured such violation within a reasonable period of time.

### D. Termination Due to Death or Disability

In the event of your death, or disability to the extent that you cannot perform the essential functions of your position with reasonable accommodation, your employment will be terminated effective on the last day of the month that such death or disability occurs.   We mutually recognize that the Company has a disability plan that is separate from this letter agreement.

### 4.  Confidential Information

A critical aspect of your position is your access to trade secret, proprietary, and confidential information. For example, your knowledge of the exact amounts and holdings of Company-related investment positions is confidential.   While some of that information may eventually be made public, the information is extremely sensitive and is to be treated as confidential until it is released.   Likewise, computer models and programs developed by the Company or purchased by it are proprietary and confidential.   Other information the Company possesses as trade secrets or confidential information include its marketing strategies, marketing plans, compensation arrangements, benefit plans, and ideas and inventions of its employees.

These are simply examples of the types of information the Company considers trade secret and/or confidential. As time passes, the Company will no doubt develop new categories of information it considers trade secret and/or confidential. As this occurs, the Company will identify such new categories of information and remind you of your obligation to treat it as confidential.   The importance of all of the types of information identified here is that the Company's competitors do not have permitted access to this information and are thus unable to use it to compete with the Company.   Accordingly, these types of information create a competitive advantage for the Company and are economically valuable. Thus, you agree not to disclose or use any of the Company's trade secret and/or confidential information for your own benefit or the benefit of anyone other than the Company, during your employment or for six (6) months after the effective date of the termination of your employment relationship with the Company.

### 5.  Company Employees And Customers

You agree that, in the event of the termination of the employment relationship between you and the Company, you will not solicit or hire any Company employees for a period of six (6) months after the effective date of the termination of your employment relationship with the Company. Further, you agree that you will not solicit the business relationships you developed or acquired while working for the Company or another company affiliated with the AMVESCAP

 INVESCO

Group for a period of six (6) months after the effective date of the termination of your employment.

### 6. Inventions And Ideas

Since the Company is paying you for your time and efforts, you agree that all information, ideas, and inventions you develop while employed by the Company related in any way to the Company's business, are the sole property of the Company. This includes all investment models, processes, and methodologies you develop while employed by the Company. Indeed, one of the reasons for your employment is the creation of such ideas. This information is confidential and trade secret information as discussed above. You understand that the Company may seek to patent or to obtain trademark or copyright protection related to such information, ideas, and inventions, and that, if necessary, you will assign any interest you may have in such information, ideas, and inventions you develop to the Company.

### 7. Return of Company Property

Upon the termination of your employment, you agree to return all property of the Company. To the extent such property is information of which you have detailed knowledge but no electronic or other documents containing such information, you agree to itemize such information in writing for the Company prior to the effective date of the termination of your employment.

### 8. Assignment

You agree that this letter agreement may be assigned to any other entities in the AMVESCAP Group, or to any successor company by acquisition of either the Company's stock or its assets. In the case of such an assignment by the Company, you understand and agree that you would continue to be bound by this letter agreement. No such assignment, without your consent, shall require you to change your duties or to move from your principal residence.

### 9. Choice of Law and Forum

We agree that, in the event of a disagreement between you and the Company about any aspect of your employment with the Company or this letter agreement, Kentucky substantive law, without regard to Kentucky's choice of law rules, will govern any litigation or proceeding brought by either party. You also agree that any litigation or proceeding shall be brought in Jefferson County, Kentucky, in either state or federal court, as appropriate.

### 10. Notice

We agree that any notice that is to be given under this letter agreement is properly given when delivered in person, by certified mail, or by over night delivery such as Federal Express.

- 4 -

 INVESCO

### 11. Prior Agreements

This letter agreement extinguishes and replaces any previous written employment agreement between you and the Company.

We are very grateful for the significant contributions you are making to the Company and look forward to working with you in the future.

INVESCO Fixed Income/
Stable Value Division

By: _____
     A. George Baumann

Accepted: <u>12 - January - 2001</u>
         Date

**Kenneth R. Bowling**

*Global Partner Contract Attachment*

**Name**    Kenneth R. Bowling
             Director of Product Strategy

Date of hire:  2/17/1993

*Statement of Responsibilities*

Development of product strategy

**Base Compensation Effective January 1, 2001:  $200,000.00**

Exhibit D

 INVESCO

### Global Partner Agreement
### Randy G. Paas

INVESCO Fixed Income/Stable Value Division (the "Company"), part of the AMVESCAP Group, wishes to employ you as a Global Partner under the terms and conditions set forth in this letter. The term "Global Partner" is used throughout the AMVESCAP Group to refer to the most senior group of officers and employees. The purpose of this letter is to articulate the terms and conditions of your employment. [This letter agreement also extinguishes and replaces your previous Global Partner Agreement.]

It is important to note at the outset that both the Company and AMVESCAP Group consider you an important part of its continued success. Further, please note that under the terms of this letter agreement, which is a binding contract, neither the Company nor you has any right to terminate the employment relationship except as set forth below.

### 1. Duties Of Employment

You agree to perform the duties assigned to you by the Company as more specifically stated in an attachment to this letter. The attachment may be modified in the future if you and the Company agree in writing. You understand and agree that during your employment relationship with the Company, you are not allowed, without proper prior approval, to perform any business activities for any person or entity other than the Company or another company that is part of the AMVESCAP Group. Of course, if you obtain the Company's prior written approval, you may perform other business activities.

It is your obligation to comply with all Company policies and procedures, including those set forth in any Code of Ethics and other materials distributed by the Company to its employees. Further, you agree to comply with all applicable rules and regulations that pertain to the Company's business.

As a Global Partner you have important duties to the Company: the duty to refrain from dealing in your self interest above that of the Company's, the duty to disclose any information that indicates that you may be exposed to a conflict of interests, the duty of loyalty, and the duty to refrain from using the Company's business opportunities for your own benefit. These fiduciary obligations and others arise because of the unique trust and confidence the Company places in you as a Global Partner.

 INVESCO

### 2. Compensation

Your annual salary is set forth in an attachment to this letter. You will also receive certain bonuses and stock awards as approved from time to time by the Company. The attachment may be modified in the future as agreed by you and the Company in writing.

### 3. Term

The term of your employment relationship with the Company shall be for one year from the date of your signature on this letter. This term will automatically renew at the end of the initial term for another year and will continue to renew every year, unless your employment is terminated in a manner specified below,. In no event will the term of your employment relationship with the Company be less than the unexpired period of any notice of intent to terminate given as set forth below. Your employment can only be terminated as specifically set forth below.

#### A. Termination Effective After Expiration of Notice Period

Either you or the Company may terminate the employment relationship at any time during the initial term or any renewal, upon _12_ * (see Note) months written notice to the other party. Notice of intent to terminate will be considered given upon mailing or actual receipt, whichever occurs first. Whether you or the Company give the notice of termination, your employment will continue for the entire notice period. The effective date of the termination of the employment relationship will be the last day of the notice period.

[*Note*: The Company is willing to agree to a minimum four month notice period, but will accept up to twelve months as a reasonable notice period. Please fill in and initial the notice period that you desire. If you do not designate a number of months in the blank or if you designate a number less than four months, you are agreeing to the default notice period of four months.]

#### B. Termination by Mutual Agreement

You and the Company can, effective immediately, terminate the employment relationship without cause or notice, but such a mutual termination will only be effective if you and the Company both agree to the termination in writing. Such an agreement must be signed by the Chief Executive Officer of the Company to be effective.

#### C. Termination with Cause

Your employment may be terminated effective immediately upon written notice if the Company believes in good faith that you engaged in the following conduct:

(1)   After written notice, any continuing violation of this agreement or Company policies or procedures;

(2)   Your conviction of committing a criminal act;

 INVESCO

    (3)    Any violation of law or regulation related to the business of the Company or affecting your ability to perform your duties;

    (4)    Your bankruptcy or insolvency.

You may terminate your employment effective immediately if the Company, after written notice, has engaged in any continuing violation of this letter agreement and has not cured such violation within a reasonable period of time.

### D. Termination Due to Death or Disability

In the event of your death, or disability to the extent that you cannot perform the essential functions of your position with reasonable accommodation, your employment will be terminated effective on the last day of the month that such death or disability occurs. We mutually recognize that the Company has a disability plan that is separate from this letter agreement.

### 4. Confidential Information

A critical aspect of your position is your access to trade secret, proprietary, and confidential information. For example, your knowledge of the exact amounts and holdings of Company-related investment positions is confidential. While some of that information may eventually be made public, the information is extremely sensitive and is to be treated as confidential until it is released. Likewise, computer models and programs developed by the Company or purchased by it are proprietary and confidential. Other information the Company possesses as trade secrets or confidential information include its marketing strategies, marketing plans, compensation arrangements, benefit plans, and ideas and inventions of its employees.

These are simply examples of the types of information the Company considers trade secret and/or confidential. As time passes, the Company will no doubt develop new categories of information it considers trade secret and/or confidential. As this occurs, the Company will identify such new categories of information and remind you of your obligation to treat it as confidential. The importance of all of the types of information identified here is that the Company's competitors do not have permitted access to this information and are thus unable to use it to compete with the Company. Accordingly, these types of information create a competitive advantage for the Company and are economically valuable. Thus, you agree not to disclose or use any of the Company's trade secret and/or confidential information for your own benefit or the benefit of anyone other than the Company, during your employment or for six (6) months after the effective date of the termination of your employment relationship with the Company.

### 5. Company Employees And Customers

You agree that, in the event of the termination of the employment relationship between you and the Company, you will not solicit or hire any Company employees for a period of six (6) months after the effective date of the termination of your employment relationship with the Company. Further, you agree that you will not solicit the business relationships you developed or acquired while working for the Company or another company affiliated with the AMVESCAP

 INVESCO

Group for a period of six (6) months after the effective date of the termination of your employment.

### 6. Inventions And Ideas

Since the Company is paying you for your time and efforts, you agree that all information, ideas, and inventions you develop while employed by the Company related in any way to the Company's business, are the sole property of the Company. This includes all investment models, processes, and methodologies you develop while employed by the Company. Indeed, one of the reasons for your employment is the creation of such ideas. This information is confidential and trade secret information as discussed above. You understand that the Company may seek to patent or to obtain trademark or copyright protection related to such information, ideas, and inventions, and that, if necessary, you will assign any interest you may have in such information, ideas, and inventions you develop to the Company.

### 7. Return of Company Property

Upon the termination of your employment, you agree to return all property of the Company. To the extent such property is information of which you have detailed knowledge but no electronic or other documents containing such information, you agree to itemize such information in writing for the Company prior to the effective date of the termination of your employment.

### 8. Assignment

You agree that this letter agreement may be assigned to any other entities in the AMVESCAP Group, or to any successor company by acquisition of either the Company's stock or its assets. In the case of such an assignment by the Company, you understand and agree that you would continue to be bound by this letter agreement. No such assignment, without your consent, shall require you to change your duties or to move from your principal residence.

### 9. Choice of Law and Forum

We agree that, in the event of a disagreement between you and the Company about any aspect of your employment with the Company or this letter agreement, Kentucky substantive law, without regard to Kentucky's choice of law rules, will govern any litigation or proceeding brought by either party. You also agree that any litigation or proceeding shall be brought in Jefferson County, Kentucky, in either state or federal court, as appropriate.

### 10. Notice

We agree that any notice that is to be given under this letter agreement is properly given when delivered in person, by certified mail, or by over night delivery such as Federal Express.

 INVESCO

## 11.   Prior Agreements

This letter agreement extinguishes and replaces any previous written employment agreement between you and the Company.

We are very grateful for the significant contributions you are making to the Company and look forward to working with you in the future.

INVESCO Fixed Income/
Stable Value Division

By: _____
A. George Bahmann, President

Accepted __1__|__11__|__2001__
           Date

_____
Randy G. Paas

- 5 -

*Global Partner Contract Attachment*

Name:          **Randy G. Paas**

Title:          **Vice President**

Date of Hire:     **November 16, 1993**

*Statement of Responsibilities*

Randy is an Account Manager, responsible for PRIMCO's relationship with stable value clients. He also supervises members of the marketing team and their support staff.

**Base Compensation Effective January 1, 2001: $200,000.00**

Exhibit E

# MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding ("Memorandum") is made on this ____ day of March, 2007 by and between Invesco Institutional (N.A.), Inc., ("Invesco") and Deutsche Investment Management Americas Inc., ("Deutsche," and together with Invesco, the "Parties", and each of them a "Party," the term Party to include their respective successors and assigns).

The purpose of the Memorandum is to set forth certain transactions which the Parties mutually intend to consummate forthwith and to specify the principal terms that shall govern these transactions.

I.   Portfolio Team.   Invesco currently serves as investment manager for certain fixed income separately managed accounts and investment vehicles (each an "Account") pursuant to various investment management agreements (the "IMAs").   Key members of the fixed income portfolio management team (commonly referred to as the Worldwide Fixed Income Group) responsible for the investment management services rendered by Invesco to the Accounts are listed on Annex A hereto, as such may be amended by mutual agreement of the Parties (collectively, the "Portfolio Team").

II.   Team Transition.   Deutsche and Invesco mutually acknowledge the intention of the Portfolio Team, as well as certain other Invesco employees who service the Accounts and work with the Portfolio Team (collectively, "Related Team Members"), to resign from their employment with Invesco and commence employment with Deutsche (the "Team Transition").   The Related Team Members are also listed on Annex A hereto.   Deutsche will work together in good faith with Invesco to transition employment of the Portfolio Team and Related Team Members from Invesco to Deutsche, taking into consideration the current investment objectives and interests of the Accounts. As consideration for Deutsche's efforts in respect of such transition, Invesco hereby agrees to (A) waive any applicable notice provisions to which the Portfolio Team and Related Team Members may be subject, (B) not take any action, including commencing a legal proceeding, to impede, delay or prevent the Team Transition, or induce any member of the Portfolio Team or Related Team Member not to commence employment with Deutsche, and (C) waive and release any claims or causes of action it may have against Deutsche, the Portfolio Team and/or Related Team Members in connection with the Team Transition.

III.   Account Transition.   Subject to applicable law, the Parties agree to use their reasonable best efforts to negotiate in good faith a transition of the management of the Accounts from Invesco to Deutsche for reasonable compensation, which may include, among other things, (A) a transfer of certain IMAs by Invesco to Deutsche, (B) retention by Invesco of Deutsche to serve as sub-investment manager to certain Accounts, (C) a merger of certain Invesco pooled vehicles into Deutsche pooled vehicles, or (D) a combination thereof (collectively, the "Account Transition"). Invesco agrees to waive and release any claims or causes of action it may have against Deutsche, the Portfolio Team and/or Related Team Members in connection with the Account Transition.

IV.   Required Consents, Approvals and Amendments.   The Parties shall use their reasonable best efforts and work together in good faith and subject to applicable law to procure from and/or provide to, including but not limited to, affected clients of Invesco, regulatory agencies, and relevant third parties, any notifications, consents, approvals or documentary amendments reasonably required to consummate the Account Transition.   Any notification or communication to Invesco's clients with respect to the Account Transition shall be approved by both Parties, and such approval shall not be unreasonably withheld.

V.   Access to Books and Records.   From the date of this Memorandum until December 31, 2007 (the "Access Period"), Invesco shall provide to Deutsche a right of access (upon reasonable prior notice and at all times under the supervision of Invesco) to all books and records that Deutsche is required by law to maintain or otherwise reasonably relates to the Account Transition (other than any human resources, personnel and compensation records of the Portfolio Team and/or Related Team

Members).    Deutsche shall be permitted to make copies of all such books and records at its own expense (and if Invesco provides such copies, Invesco agrees to do so in a reasonably prompt manner and at a reasonable expense).

The Parties agree that this Section shall not obligate Invesco to provide Deutsche or afford Deutsche access to any books and records to the extent such provision or access would contravene any applicable laws or regulations; provided, however, in each such case, Invesco shall provide to Deutsche a general description of the books and records so withheld and the legal basis therefor.

VI.    Performance Record of Portfolio Team.    Invesco agrees and acknowledges that upon consummation of the Team Transition, Deutsche shall take entitlement to the investment performance record of the Portfolio Team and Related Team Members relating to all Accounts and shall be entitled to copies of books and records associated therewith; provided, however, that Deutsche hereby acknowledges and agrees that such performance record and books and records are being delivered hereto "as is" with no representations or warranties relating to their accuracy or completeness.

VII.    Public Announcement.    Any public announcement relating to the Team Transition or the Account Transition shall be approved by both Parties, and such approval shall not be unreasonably withheld; provided, however, that all matters relating to the Team Transition and Account Transition will be kept confidential by the Parties until such Public Announcement.

VIII.    Confidential Information.    Each of the Parties may be given access to confidential and proprietary information relating to the other Party in relation to the Team Transition and/or Account Transition.    "Confidential Information" shall mean material information or information proprietary to either Party or designated as Confidential Information by either Party and not generally known by third parties, and shall include all information relating to the Team Transition and Account Transition.

The Parties will protect Confidential Information and will only disclose Confidential Information to its officers, directors, employees, affiliates, agents and representatives who "need to know" the Confidential Information and will only use the Confidential Information in furtherance of the Team Transition and the Account Transition.    Each Party will use commercially reasonable security measures to protect all Confidential Information from misuse or misappropriation and will report any misuse or misappropriation to the other Party as soon as possible.    Each Party may disclose Confidential Information if such disclosure is requested by or through, or related to a judicial, administrative, governmental or self-regulatory organization process, investigation, inquiry or proceeding, or otherwise required by applicable law.    In such case, the disclosing Party will notify the other Party of the disclosure described in the preceding sentence to the extent permitted by applicable law.

IX.    Expenses.    Except as specifically set forth herein, or as may be mutually agreed to by both Parties, Invesco and Deutsche will each be responsible for its own expenses related to the proposed Team Transition and Account Transition, including, without limitation, any fees and expenses of outside consultants and legal counsel.

X.    Binding Agreement.    The Parties acknowledge that this Memorandum is a legally binding agreement.

XI.    Term Provisions.    Neither Party shall be entitled to terminate this agreement except in the case of fraudulent misrepresentation by either Party, or upon the mutual agreement of the Parties.

XII.    Survival.    The obligations set forth in the last sentences of Sections II and III and Section VIII in its entirety shall survive the termination of this Memorandum.

XIII.    Governing Law.    This Memorandum shall be governed by, and construed in accordance with, the internal laws of the State of New York.

XIV.    Amendments; Modifications.  No amendment, modification or waiver of this Memorandum shall be valid unless it is in writing and duly executed by each Party.  Unless expressly agreed in writing, no modification shall constitute a general waiver of any provision of this Memorandum, nor shall it affect any rights, obligations or liabilities under or pursuant to this Memorandum which have already accrued up to the date of modification, and the rights and obligations under or pursuant to this Memorandum shall remain in full force and effect except and only to the extent they are so modified by the Parties in any supplemental agreements.

XV.    Counterparts.    This Memorandum may be executed in any number of counterparts, each of which is an original but all of which taken together shall constitute one and the same instrument.

[Execution Page Follows This Page]

**AS WITNESS**, this Memorandum of Understanding has been signed on behalf of each Party by a duly authorized signatory thereof as of the day and year first above written.

For and on behalf of:

**INVESCO INSTITUTIONAL (N.A.), INC.**

_____

By:

Name:

Title:

For and on behalf of:

**DEUTSCHE INVESTMENT MANAGEMENT AMERICAS INC.**

_____

By:

Name:

Title:

_____

By:

Name:

Title:

Exhibit F

-----Original Message-----
From:   Kevin Parker [mailto:kevin.parker@db.com]
Sent:   Sun Mar 25 12:52:12 2007
To:     Flanagan, Marty
Subject:

Marty
I believe I was clear on friday that numerous individuals which constitute the majority of your senior FI team will be resigning on monday afternoon and that the chance of changing their minds at that point was remote.

I thought I also was clear that we would be prepared to arrive at a smooth transition of the business.  I also tried to impress upon you the point that the resignation of so many of the key members of your staff would undoubtedly result in near total asset loss for investco.

I appreciate you and your senior management team have tried to negotiate with your FI team and it should be crystal clear by now that this approach is not working.

I also appreciate that the way in which the situation has been communicated to staff in blast emails and so forth, that certain disclosure issues may have arisen accelerating the need to conclude this matter promptly.

What I would suggest at this point is that Investco sign the binding MOU and we arrange a conference call later this afternoon to begin negotiations.

I hope I was also made clear on friday that we are prepared to start this business de novo with little or no assets if necessary.  We are highly confident that over time we will attract sizable client relationships/assets to our platform.

I look forward to hearing from you soon to explore how we can move forward to find an amicable solution and one that at least has your organization preserving some value.

Regards
Kevin Parker
--------------------
Sent from my BlackBerry Handheld.

Exhibit G



## Deutsche Asset Management announces major expansion of its Global Institutional Fixed Income Investment team

**Stephen Johnson, Kenneth Bowling, James Guenther and Randy Paas to join**

**New York, March 26, 2007**

Deutsche Bank's Asset Management division (DeAM) today announced a major expansion of its Institutional Fixed Income Investment team. A team of four senior investment managers and 12 additional senior staff will join DeAM from INVESCO, including the Chief Investment Officer for INVESCO Worldwide Fixed Income group, Stephen M. Johnson, who oversees $93.7bn in assets under management*. Also joining will be Kenneth R. Bowling, James Guenther, and Randy G. Paas. The group will report to Bart Grenier, Managing Director and Global Head of Specialty Fixed Income for DeAM.

"This is a significant expansion to our Global and U.S. Institutional Fixed Income Investment team and demonstrates our strong commitment to bringing market-leading strategies to our clients worldwide," said Kevin Parker, Global Head of Deutsche Asset Management and Member of the Deutsche Bank Group Executive Committee.

Johnson, Chief Investment Officer for INVESCO Worldwide Fixed Income group, and a portfolio manager for INVESCO's Total Return Fund, will join DeAM as a Managing Director. Prior to INVESCO, Johnson had Fixed Income portfolio management responsibilities with the capital management division of PNC Bank. He earned a BS from the University of Kansas, an MBA from Rice University and holds a CFA designation.

Bowling, Director of U.S. Fixed Income and Portfolio Manager for INVESCO Institutional Worldwide Fixed Income, also will join DeAM as a Managing Director. As Director of U.S. Fixed Income, Bowling has investment and oversight responsibility for the sector specialist teams and domestic portfolio management teams, including Enhanced Cash, Stable Value, Intermediate and Core Fixed Income. He earned a BS and MS in Engineering from the University of Louisville.

Guenther will join DeAM as a Managing Director from INVESCO where he is Director of Global Credit Research with INVESCO's Institutional Worldwide Fixed Income group, and he also is co-portfolio manager of the AIM Enhanced Short Bond Fund, responsible for portfolio management of Investment-Grade Synthetic Collateralized Debt Obligations.  Prior to INVESCO, Guenther was group Vice President at Duff and Phelps Investment Research, where he directed the firm's Financial Institution Equity research. Guenther earned a BS degree in Business Administration from Western Michigan University and attended the DePaul University of Law. He is a CFA charter holder.

Paas will be a Managing Director at DeAM. At INVESCO, he is Director of Marketing and is responsible for the $44 billion of Stable Value Business, and is a member of the Fixed Income Management Committee. He also is a Relationship Manager for key Stable Value relationships. Paas began his career with INVESCO's Fixed Income Division as Director of Marketing for PRIMCO Capital Management. He holds a BS from the

University of Arkansas.

˙www.invesco.com, as of December 31, 2006

For further information, please call:

Ted Meyer
+1 (212) 250-7253

Mayura Hooper
+1 (212) 250-5536
Media Relations, Deutsche Bank

About Deutsche Bank

Deutsche Bank is a leading global investment bank with a strong and profitable private client franchise.  A leader in Germany and Europe, the bank is continuously growing in North America, Asia and key emerging markets.  With Euro 1,128 billion in assets and 68,849 employees in 73 countries, Deutsche Bank offers unparalleled financial services throughout the world.  The bank competes to be the leading global provider of financial solutions for demanding clients creating exceptional value for its shareholders and people.

www.db.com

About Deutsche Asset Management

With approximately Euro 543 billion in assets under management globally (as of 12/31/06), Deutsche Bank's Asset Management division is one of the world's leading investment management organizations, not just in size, but in quality and breadth of investment products, performance and client service.  The Asset Management division provides a broad range of investment management products across the risk/return spectrum.

Exhibit H



print    close window

# Mark Dowding to join Deutsche Asset Management

**New York / London, March 27, 2007**

Mark Dowding will join Deutsche Bank's Asset Management division (DeAM) from INVESCO as a Managing Director in the Global Institutional Fixed Income team. Based in London, Dowding will report to Bart Grenier, Managing Director and Global Head of Specialty Fixed Income. Dowding is part of a group of five senior investment managers and 11 additional senior staff who will join DeAM from INVESCO.

"Mark will bring significant expertise in U.K. and Global Fixed Income and will further strengthen our Global Institutional Fixed Income investment platform," said Grenier.

Dowding is Director of U.K. and Global Fixed Income for INVESCO, responsible for managing multi-currency Global Fixed Income portfolios for both Retail and Institutional clients. Prior to joining INVESCO, he was a Senior Fixed Income Fund Manager for Deutsche Asset Management. Dowding earned a Bachelor of Science degree in Economics from the University of Warwick.

For further information, please call:

Media Relations, Deutsche Bank

Ted Meyer
+1 (212) 250-7253

Mayura Hooper
+1 (212) 250-5536

About Deutsche Bank

Deutsche Bank is a leading global investment bank with a strong and profitable private clients franchise. A leader in Germany and Europe, the bank is continuously growing in North America, Asia and key emerging markets. With EUR 1,126 billion in assets and 68,849 employees in 73 countries, Deutsche Bank offers unparalleled financial services throughout the world. The bank competes to be the leading global provider of financial solutions for demanding clients creating exceptional value for its shareholders and people.www.db.com

About Deutsche Asset Management

With approximately Euro 543 billion in assets under management globally (as of 12/31/06), Deutsche Bank's Asset Management division is one of the world's leading investment management organizations, not just in

size, but in quality and breadth of investment products, performance and client service.  The Asset Management division provides a broad range of investment management products across the risk/return spectrum.