UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| INVESCO INSTITUTIONAL (N.A.), INC.,<br><br>Plaintiff,<br><br>v.<br><br>DEUTSCHE INVESTMENT MANAGEMENT AMERICAS INC.<br><br>Defendant | Civil Action No. 07-CV-2622 (AKH)(MHD) |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS**

<u>TABLE OF CONTENTS</u>

<u>Page</u>

I.  PRELIMINARY STATEMENT ................................................................1

II.  FACTUAL BACKGROUND ..............................................................4

III.  ARGUMENT..................................................................10

     A.    Deutsche's Rule 12(b)(6) Motion Is An Improper Method for
          Challenging INVESCO's Well-Pled Amended Complaint .....................10

     B.    The Court Must Deny Deutsche's Motion Because INVESCO's
          Amended Complaint Properly States a Claim under Section 43(a) of the
          Lanham Act....................................................................11

          1.  Deutsche's Statements Contain Literally False Factual
              Representations....................................................12

          2.  Deutsche's Statements Also Conveyed a False Impression, Are
              Misleading in Context, and Are Likely to Deceive Consumers ..........16

     C.    The Court Should Retain Supplemental Jurisdiction
          Over the State Law Causes of Action to Further the Interests of Judicial
          Economy, Convenience and Fairness .......................................21

IV.  CONCLUSION..................................................................25

## TABLE OF AUTHORITIES

Page No(s).

Cases

*Ackerman v. National Prop. Analysts, Inc.,*
   887 F. Supp. 494 (S.D.N.Y. 1992)...............................................................21

*American Home Prods. Corp. v. Johnson & Johnson,*
   577 F.2d 160, 165 (2d Cir. 1978)............................................................ 17

*Borough of West Mifflin v. Lancaster,*
   45 F.3d 780, 789 (3d Cir. 1995)……………………………………………………23

*Chan v. Triple 8 Palace,*
   No. 03-6048, 2004 WL 1161299, at \*3 (S.D.N.Y. May 24, 2004)…………..24

*Clark Consulting, Inc. v. Financial Solutions Partners, LLC,*
   05 Civ. 06296, 2005 U.S. Dist. LEXIS 28642, \*5-6, 24
   (S.D.N.Y. Nov. 17, 2005) ...................................................................... 10

*Dunlop v. City of New York,*
   No. 06-CV-433, 2006 WL 2853972, at \*6 (S.D.N.Y. Oct 04, 2006)…………………23

*Enercomp, Inc. v. McCorhill Publ'g, Inc.,*
   873 F.2d 536, 545 (2d Cir. 1989)................................................................21

*Gmurzynska v. Hutton,*
   257 F. Supp.2d 621, 631 (S.D.N.Y. 2003),
   *aff'd* 355 F.3d 206 (2d Cir. 2004)……………………………………………………15

*Global Discount Travel Services, LLC v. Trans-World Airlines, Inc.,*
   960 F. Supp. 701 (S.D.N.Y. 1997) ......................................................... 20

*Hoover v. Ronwin,*
   466 U.S. 558, 587 (1984) ..................................................................... 10

*Itar-Tass Russian News Agency v. Russian Kurier, Inc.,*
   140 F.3d 442, 446 (2d Cir. 1998)……………………………………………………22

*Jaghory v. New York State Dep't of Ed.,*
   131 F.3d 326, 329 (2d Cir. 1997)........................................................... 10

*Johnson & Johnson-Merck Consumer Pharms Co. v. Procter & Gamble Co.,*
   285 F. Supp. 2d 389, 392 (S.D.N.Y. 2003),
   *aff'd,* 90 Fed. Appx. 8 (2d Cir. 2003) ...............................................17, 18

*Lipton v. The Nature Co.*,
  71 F.3d 464, 474 (2d Cir. 1995) .........................................................11, 16

*Luongo v. Nationwide Mutual Ins. Co.*,
  No. 95-3190, 1996 WL 445365, at *5 (S.D.N.Y. Aug. 7, 1996)..............23

*Minnesota Life Ins. Co. v. AXA Inv. MGR.*,
  Civ. 03-4383, 2005 WL 1475336, at *1-2
  (D. Minn. June 22, 2005) ..................................................... 13, 14, 15, 16

*Philatelic Found. v. Kaplan*,
  647 F. Supp. 1344, 1348 (S.D.N.Y. 1986) .............................................. 21

*Purgress v. Sharrock*,
  33 F.3d 134, 138 (2d Cir. 1994) ............................................................ 21

*Randa Corp. v. Mulberry Thai Silk, Inc.*,
  00 Civ. 4061 (LAP), 2000 U.S. Dist. LEXIS 17104
  (S.D.N.Y. Nov. 22, 2000) ...............................................................19, 20

*Riggs Inv. Mgmt. Corp. v. Columbia Inv. Partners*,
  966 F.Supp. 1250, 1274 (D.D.C. 1997) .................................................. 15

*S.C. Johnson & Son, Inc. v. Clorox Co.*,
  241 F.3d 232, 238 (2d Cir. 2001)........................................................... 12

*S&C Rest. Corp. v. Sofia's Diner Rest., Inc.*,
  Civ. 98-5972, 1999 U.S. Dist. LEXIS 12630 *9-10
  (E.D. Pa Aug. 18, 1999)........................................................................ 15

*SST Global Tech., LLC v. Chapman*,
  270 F. Supp. 444, 458-59 (S.D.N.Y. 2003)…………………………………23

*Time Warner Cable, Inc. v. DirecTV, Inc.*,
  06 Civ. 14245, 2007 U.S. Dist. LEXIS 8397, *10
  (S.D.N.Y. Feb. 5, 2007) ....................................................................... 11

*Towers Fin. Corp. v. Dun & Bradstreet, Inc.*,
  803 F. Supp. 820, 823 (S.D.N.Y. 1992).................................................. 11

*Truck Components, Inc. v. K-H Corp*,
  776 F. Supp. 405 (N.D. Ill. 1991) ....................................................18, 19

*United Indus. Corp. v. Clorox Co.*,
  140 F.3d 1175, 1180 (8th Cir. 1998)...................................................... 16

*U.S. Fire Ins. Co. v. United Limousine Service, Inc.*,
   328 F.Supp.2d 450, 453 (S.D.N.Y. 2004)..........................................23

<u>Statutes</u>

28 U.S.C. § 1404 ......................................................................... 3

28 U.S.C. § 1367(c).................................................... 16, 17, 21, 22, 23, 24

Plaintiff INVESCO Institutional (N.A.), Inc. ("INVESCO" or "Plaintiff") respectfully submits this Memorandum of Law in Opposition to Defendant Deutsche Investment Management Americas, Inc.'s ("Deutsche" or "Defendant") Motion to Dismiss.

## I.     **PRELIMINARY STATEMENT**

As described in INVESCO's Amended Complaint, this dispute arises from an unlawful scheme by Deutsche to lift out INVESCO's institutional fixed income business by inducing a team of key employees to resign simultaneously and then leveraging their departures to lure lower level employees and INVESCO's most valuable clients to Deutsche.  As Kevin Parker, a high-level Deutsche executive, revealed in an e-mail message sent to the CEO of INVESCO's corporate parent on the eve of the mass resignations, Deutsche's goal was to force INVESCO to capitulate to its demand that INVESCO not resist the lift-out and instead agree to facilitate it.

The conduct underlying INVESCO's Lanham Act cause of action forms an integral part of, and cannot be divorced from, the overall Deutsche scheme.  The first phase of that scheme involved Deutsche's secret collusion with the Global Partners who headed INVESCO's fixed income business (defined below as the "Kentucky Defendants"), to garner their commitment to join INVESCO and their cooperation in securing similar commitments from second-tier level employees.  In the next phase, Deutsche confronted INVESCO immediately prior to the date when the resignations had been carefully coordinated to begin, demanding INVESCO's acquiescence and threatening a "near total asset loss" for the business.  When INVESCO did not immediately accede to Deutsche's extortionate demands, Deutsche pulled the trigger,

causing a wave of resignations on March 26, 2007.

On that same date, Deutsche launched another critical aspect of its scheme, namely, a deceptive promotional campaign designed to increase the pressure on INVESCO, by luring clients and employees to Deutsche with representations that the Kentucky Defendants had joined, or were imminently about to join, Deutsche to head up its new fixed income business in Louisville, Kentucky.  Those representations were false when made, as Deutsche well knew, because on March 26 each of the four Kentucky Defendants had sent written notices to INVESCO, indicating that they would remain employed by INVESCO for a full year.  Indeed, when Deutsche commenced its publicity campaign, its new business was so far from being operational that Deutsche had not yet even leased office space to house the Kentucky Defendants and the rest of the team poached from INVESCO.

On March 29, 2007, when the original Complaint in this action was filed, Deutsche had only launched the deceptive publicity campaign phase of its scheme three days earlier.  INVESCO's Lanham Act claim was thus based only on the two press releases then in the public domain.  Since the filing of the original Complaint, INVESCO has become aware of additional deceptive publications.  On or about March 30, 2007, Deutsche rolled out a series of form letters that, like the press releases earlier that week, were designed to create the false impression that all of the Kentucky Defendants had joined, or imminently were joining, Deutsche and that the new fixed income business was up and running in Louisville.  Approximately two weeks later, Deutsche funneled false information to a reporter, which resulted in the publication of a trade press article reporting that all of the Kentucky Defendants had already started working for Deutsche,

when in fact three of the four remained on INVESCO's payroll.  Finally, INVESCO has just learned in discovery that Deutsche has falsely been reporting to clients and potential clients that it did not raid INVESCO, but instead that each employee would have resigned from INVESCO without Deutsche's inducement.  Each of these recently discovered false representations has been included in an Amended Complaint, which is being filed concurrently with this Memorandum of Law.

The Lanham Act claim cannot be considered in isolation, cut off from the other allegations of INVESCO's pleading.  Each act described in the Amended Complaint – from the secret scheming with four high-level INVESCO Global Partners to the launch of a deceptive media campaign – directly pertains to Deutsche's carefully conceived and executed scheme to eviscerate INVESCO's institutional fixed income business.  Each of the false representations that form the basis of the Lanham Act claim were designed to further its overall plan to force INVESCO to drop its resistance to Deutsche's raid, permitting its competitor to strip away a valuable asset for little or no consideration.

Deutsche's Motion to Dismiss should be understood in the context of its broader litigation tactic of forcing INVESCO to litigate this unitary dispute in multiple forums, wasting judicial resources and risking inconsistent results in different courts.  As the Court is aware, Deutsche has repeatedly refused to consent to transfer this case to the United States District Court for the Western District of Kentucky (the "Kentucky Court"), where the related litigation involving the four Global Partners is pending. Deutsche knows that the case against it will continue if its Motion is granted, only it will proceed in state court where there is no possibility of transfer pursuant to 28 U.S.C. §

1404.[1]  This Motion is thus nothing more than a tactical gambit on the part of Deutsche, designed to impose greater costs and inconvenience on INVESCO.  But Deutsche's strategy also threatens to undermine the interests of justice by imposing additional burdens on the judicial system and raising the spectra of inconsistent preliminary and final outcomes.

Deutsche's procedural gamesmanship should fail for the simple reason that the Amended Complaint sufficiently states a claim under Section 43(a) of the Lanham Act.

## II.   FACTUAL BACKGROUND

INVECO is a global financial services firm, ultimately owned by AMVESCAP plc ("AMVESCAP").  *See* Amended Complaint ("Am. Compl."), ¶ 5.  INVESCO has operations in the Louisville, Kentucky area.  *Id.*  The Worldwide Fixed Income ("WFI") group, an operating group within AMVESCAP, focuses on the management of fixed income investments with many of the group's members employed by INVESCO.  *Id.*  Stephen M. Johnson ("Johnson"), James F. Guenther ("Guenther"), Kenneth R. Bowling ("Bowling"), and Randy G. Paas ("Paas") (collectively, the "Kentucky Defendants") were long-standing employees of INVESCO working in its WFI group in Louisville.  *Id.* at ¶ 11.  The Kentucky Defendants had each achieved the designation of Global Partner, a status reserved for select employees that have demonstrated exceptional ability and have made a substantial contribution to INVESCO's business.  *Id.*

Over a period of several months prior to March 23, 2007, each of the Kentucky Defendants carried on secret discussions with Deutsche, a competitor of INVESCO, regarding leaving employment at INVESCO to work at Deutsche.  *Id.* at ¶ 15.  In an

---

[1] Deutsche and INVESCO are both Delaware corporations, and there is thus not a diversity basis for jurisdiction in this Court or the Kentucky Court.

effort to trigger a cascade of staff resignations and client defections, Deutsche and the

Kentucky Defendants planned to have the Kentucky Defendants resign simultaneously

and start immediately at Deutsche, along with a somewhat larger group of second-tier

employees who coordinated their resignations on the same date.  *Id*. at ¶¶ 15, 17.

Deutsche's plans to lift out the entire team in one fell swoop was complicated, however,

by the fact that each of the Kentucky Defendants had executed Global Partner

Agreements with INVESCO, in which each one had selected a mutual twelve-month

notice requirement.

On March 23, 2007, Kevin Parker, Global Head of Deutsche Asset Management,

met with AMVESCAP's Chief Executive Officer and announced that on the following

Monday and Tuesday, INVESCO would receive a series of resignations of key WFI

personnel, and threatened that after the resignations there would be virtually nothing left

of the WFI business.  *Id*. at ¶ 18.  Deutsche expected to railroad INVESCO into waiving

the twelve-month notice provisions in the Kentucky Defendants' agreements and

otherwise acquiescing in Deutsche's raid, but INVESCO rejected Deutsche's extortionate

tactics.  *Id*. at ¶ 18, 22.  The Kentucky Defendants then delivered essentially identical

resignation letters to INVESCO, in which each affirmatively represented that he would

honor his agreement's notice provision and continue working for INVESCO for an

additional year.  *Id* at ¶ 23.

Frustrated by INVESCO's refusal to capitulate, Deutsche undertook to increase

the pressure on INVESCO by launching the next phase of its scheme, a deceptive

promotional campaign designed to elicit further resignations and accelerate client moves.

With full knowledge of the Kentucky Defendants' written representations that they would

stay at INVESCO for another year, on March 26, 2007, Deutsche issued a press release

designed to mislead INVESCO's and Deutsche's clients into believing that Deutsche had

already hired away the Kentucky Defendants, that their arrival at Deutsche was

imminent, and that they would shortly be in charge of Deutsche's expanded "Institutional

Fixed Income Investment" team on the ground in Louisville, Kentucky.  *Id.* at ¶ 24 &

Exhibit G.  In fact, the Kentucky Defendants were not due to start working for Deutsche

for at least one year, there were no executives in place to lead the new institutional fixed

income business, and there were not even offices or infrastructure in Louisville from

which this business could operate when its leaders finally arrived.

The first two paragraphs of the March 26, 2007, press release read as follows:

"DEUTSCHE ASSET MANAGEMENT ANNOUNCES MAJOR
EXPANSION OF ITS GLOBAL INSTITUTIONAL FIXED
INCOME INVESTMENT TEAM."

Stephen Johnson, Kenneth Bowling, James Guenther and Randy Paas to
join

New York, March 26, 2007

*Deutsche Bank's Asset management division (DeAM) today announced a
major expansion of its Institutional Fixed Income Investment team.*  A
team of four senior investment managers and 12 additional senior staff
will join DeAM from INVESCO, including the Chief Investment Officer
for INVESCO Worldwide Fixed Income group, Stephen M. Johnson, who
oversees $93.7bn in assets under management.  Also joining will be
Kenneth R. Bowling, James Guenther, and Randy G. Paas.  The group will
report to Bart Grenier, Managing Director and Global Head of Specialty
Fixed Income for DeAM.

"*This is a significant expansion to our Global and U.S. Institutional Fixed
Income Investment team* and demonstrates our strong commitment to
bringing market-leading strategies to our clients worldwide," said Kevin
Parker, Global Head of Deutsche Asset Management and member of the
Deutsche Bank Group Executive Committee.

*See* Am. Compl., Ex. G (emphasis added).  The press release proceeds to describe the Deutsche positions and titles assigned to each of the four Kentucky Defendants, but makes no further mention of the "12 additional senior staff," the only ones actually able to commence work on March 26.  *Id.*  The sole purpose of mentioning those "12 additional senior staff," all of whom were actually starting on or about March 26, was to provide an inaccurate timeframe for the reader as to the Kentucky Defendants' start date.

Deutsche issued a second false press release on March 27, 2007 regarding a London-based INVESCO employee, Mark Dowding.  *See* Am. Compl., ¶ 26 & Ex. H. The second press release added to the false picture Deutsche was painting – that the Louisville, Kentucky-based fixed income business was fully operational and the arrival of the Kentucky Defendants was imminent.  The press release stated, in pertinent part, that Dowding "will join Deutsche Bank's Asset Management division (DeAM) from INVESCO" and touted that he is "part of a group of five senior investment managers and 11 additional senior staff who will join DeAM from INVESCO."  *See* Am. Compl., Exhibit H.  Again, Dowding had committed to working at INVESCO for an additional four months, a fact known to Deutsche, but Deutsche's press release intentionally grouped him with the "additional senior staff" who had already started.  *See* Am. Compl., ¶ 26.

On March 26, 2007, prior to Deutsche's publication of the first press release, INVESCO filed a complaint in the Supreme Court of the State of New York, County of New York for tortious interference, aiding and abetting breaches of fiduciary duties, misappropriation of trade secrets, and common law unfair competition.  When INVESCO learned of the false and misleading press releases, it promptly withdrew its state court

complaint and filed this action, including its Lanham Act claim.

Since the filing of the original Complaint and as discovery has commenced, INVESCO has learned of additional false promotional statements made by Deutsche to its clients and potential clients.  These misrepresentations, described in INVESCO's Amended Complaint, illustrate that the allegations made in the original Complaint described only a sampling of Deutsche's false and deceptive commercial activities which mischaracterize the nature, quality and characteristics of both INVESCO's and Deutsche's services, with more to be uncovered as discovery proceeds.  On March 30, 2007, Andy Kiehl, a former employee of INVESCO, who joined Deutsche the week of March 26, sent a form letter on Deutsche letterhead to his former INVESCO clients informing them that he has joined Deutsche.  *See* Am. Compl. ¶¶28-29 & Ex. I.  This letter states, among other things, that the Kentucky Defendants "will be joining the Institutional Fixed Income Investment platform as Managing Directors" at Deutsche, again creating the misleading impression that the Kentucky Defendants will imminently join Deutsche and will shortly be available to service clients.  *See id.*

Deutsche also used mainstream media outlets to further its scheme.  On April 16, 2007, *Pensions & Investments*, a publication widely read by INVESCO's and Deutsche's clients and employees, published an article concerning Deutsche's raid on INVESCO.  In a portion of the article in which Parker is quoted extensively, it is falsely reported that Deutsche had already hired all of the Kentucky Defendants.  *See* Am. Compl. ¶30 & Ex. J.  The article includes the following passage:

> Deutsche *is now officially opening an office in Louisville*, its first presence in the city, to house the 13 Louisville-based team members hired last month from INVESCO, *including three former global partners from INVESCO's worldwide fixed-income business – Stephen M. Johnson,*

> *chief investment officer of fixed-income group; Kenneth Bowling, director of fixed income and a portfolio manager; and James Guenther, director of global credit research.*  The trio helped oversee roughly $94 billion in fixed-income assets at INVESCO.

*Id.* (emphasis added).  Parker is quoted directly before and after the text quote above, making clear that the information could have come from no other source but Deutsche. The article again creates a misleading impression of the services offered by Deutsche, falsely stating that Messrs. Johnson, Bowling and Guenther had *already* started work at Deutsche and describing the opening of an office for which space had not even been leased as of the time the article was published.  *See* Am. Compl. ¶ 30.

Discovery has revealed further support for INVESCO's Lanham Act claim.  On May 4, Kevin Parker testified at his deposition that he has received inquiries from clients, voicing concern about Deutsche's heavy-handed tactics vis-à-vis INVESCO.  Parker admitted that he has made statements to these clients, flatly denying that Deutsche has engaged in any sort of raid on INVESCO's institutional fixed income business.  *See* Declaration of Michael E. Johnson, dated March 9, 2007 ("Johnson Decl."), Ex. 1. Parker's mollifying assurances fly in the face of the ample evidence discovered already in this litigation (as well as the related litigation pending in the Kentucky Court) that Deutsche carefully hatched and executed a plan to lift out the human capital core of INVESCO's business.

Because Deutsche continues to publish false statements in furtherance of its overall scheme to force INVESCO into submission, INVESCO's recently-filed motion for a preliminary injunction seeks an order prohibiting Deutsche from, *inter alia*, engaging in further conduct in violation of the Lanham Act.  INVESCO has also filed a

motion for a preliminary injunction in the Kentucky Litigation; this week the Kentucky
Court granted a Temporary Restraining Order at INVESCO's request, enjoining the three
Kentucky Defendants still employed by INVESCO from starting work at Deutsche.  *See*
Johnson Decl. Ex. 2.

### III.    ARGUMENT

A.    Deutsche's Rule 12(b)(6) Motion Is An Improper Method for Challenging
       INVESCO's Well-Pled Amended Complaint.

Pursuant to Rule 12(b)(6), a "court may not dismiss a complaint unless 'it appears
beyond doubt, even when the complaint is liberally construed, that the plaintiff can prove
no set of facts which would entitle him to relief.'" *Jaghory v. New York State Dep't of
Ed.*, 131 F.3d 326, 329 (2d Cir. 1997) (quoting *Hoover v. Ronwin*, 466 U.S. 558, 587
(1984)); *see also Clark Consulting, Inc. v. Financial Solutions Partners, LLC*, 05 Civ.
06296, 2005 U.S. Dist. LEXIS 28642, *5-6, 24 (S.D.N.Y. Nov. 17, 2005) (denying
defendants' Rule 12(b)(6) motion to dismiss plaintiff's Section 43(a) claim because
"Rule 8 simply requires a short plain statement of the facts giving rise to the asserted
claim.")  Courts must accept all factual allegations in the complaint as true and draw all
reasonable inferences in plaintiff's favor.  *Jaghory*, 131 F.3d at 329.

INVESCO's Lanham Act claim, as set forth in its Amended Complaint, easily
survives the instant Motion to Dismiss.  Moreover, further discovery will certainly bolster
INVESCO's evidence of a sweeping misinformation campaign designed to confuse and
deceive INVESCO's and Deutsche's clients.  Dismissal of INVESCO's Lanham Act
claim at this early stage of the litigation would therefore be improper.

B.  The Court Must Deny Deutsche's Motion Because INVESCO's Amended
Complaint Properly States a Claim under Section 43(a) of the Lanham Act.

Section 43(a) is intended to protect consumers and competitors from false and
misleading advertisements and promotions.  In accordance with the requirements for a
claim under this section of the Lanham Act, INVESCO has pled that (1) Deutsche made
false or misleading factual representations regarding the nature, characteristics, or
qualities of both INVESCO's and Deutsche's goods or services; (2) that Deutsche used
the false or misleading representations "in commerce;" (3) that Deutsche made the false
or misleading representations in the context of commercial advertising or commercial
promotion; and (4) that INVESCO was likely to be damaged by the false or misleading
representations.  *See Towers Fin. Corp. v. Dun & Bradstreet, Inc.*, 803 F. Supp. 820, 823
(S.D.N.Y. 1992).  Deutsche's Motion to Dismiss challenges only the sufficiency of
INVESCO's Amended Complaint as to the first element of the Lanham Act claim.  The
Motion should fail because the Amended Complaint clearly sets forth facts as to
Deutsche's false and misleading representations regarding the nature, characteristics, and
qualities of INVESCO's and Deutsche's services.

The first element of a Lanham Act claim, falsity, "may be established by proving
that (1) the advertising is literally false as a factual matter, _or_ (2) although the
advertisement is literally true, it is likely to deceive or confuse consumers."  *Lipton v. The
Nature Co.*, 71 F.3d 464, 474 (2d Cir. 1995) (emphasis added).   When considering false
advertising claims, "the Court is to bear in mind that 'fundamental to any task of
interpretation is the principle that text must yield to context' and that the Court must
'consider the advertisement[s] in [their] entirety and not engage in disputatious
dissection.  The entire mosaic should be viewed rather than each tile separately.'"  *Time*

11

*Warner Cable, Inc. v. DirecTV, Inc.*, 06 Civ. 14245, 2007 U.S. Dist. LEXIS 8397, *10

(S.D.N.Y. Feb. 5, 2007) (quoting *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232,

238 (2d Cir. 2001)).

1.      Deutsche's Statements Contain Literally False Factual
Representations.

The Amended Complaint sufficiently alleges that the two press releases and the

form letter to clients are literally false, as in their entirety, they impress upon the target

audience that the INVESCO employees' arrival at Deutsche has either already happened

or is imminent, when in fact each of the named employees, at the time Deutsche

published the press releases, had committed to remaining at INVESCO for many months.

Am. Compl. ¶¶ 23-25, 28-29.  For example, the first sentence of the March 26 press

release utilizes the past tense (touting that Deutsche "*announced* a major expansion of its

Institutional Fixed Income Investment team"), conveying to the reader the message that

the transition of the team from INVESCO was a *fait accompli.  Id.*  That misinformation

is reinforced in the following sentence, where Deutsche represents that the four Kentucky

Defendants *and* twelve second tier staff "will join DeAM from INVESCO."  By

describing the arrival of the four Kentucky Defendants, who had just notified INVESCO

that they would stay for another year, in the same sentence as the twelve second tier staff,

who were apparently joining Deutsche immediately, Deutsche sought to mislead the

readers of its press release into believing that the entire team was arriving in one fell

swoop.[2]  Immediately after identifying the four Kentucky Defendants by name, Parker is

quoted as saying "[t]his *is* a significant expansion to our Global and U.S. Institutional

Fixed Income Investment team" (emphasis added).  *Id.*  Taken in aggregate, the

---

[2] Many INVESCO clients were aware that the second-tier employees had already defected to Deutsche, as those employees were already contacting clients the week of March 26.  *See* Am. Compl. Ex. I.

statements in the press releases and form letter falsely convey to clients and potential

clients that the Kentucky Defendants were arriving at Deutsche imminently, at the same

time as their direct reports were joining, when in fact Deutsche knew that the leaders of

its new "team" could not be expected to join for another year.  Indeed, the reference to

the second tier employees in both press releases appears to have been included for no

purpose other than to create the illusion that the four Kentucky Defendants were arriving

at the same time as (or close in time to) the employees who were already on board at

Deutsche.

        The April 16 *Pensions and Investments* article contains further literal falsehoods,

stating in black and white that Deutsche had *already* hired Johnson, Bowling and

Guenther "last month from INVESCO."  *See* Am. Compl. Ex. J.  The article further states

that Deutsche "is now officially opening an office in Louisville," suggesting that the

office for which a lease had not been signed was open for new business.  *Id.*  These are

both indisputable falsehoods, spoon-fed by Deutsche to a reporter who was unaware of

Deutsche's broader scheme.

        Courts have required much less to find literal falsity in the context of a company's

publication of misleading information about a raid of a competitor's employees.  In a

remarkably similar case, AXA Investment Manager ("AXA"), which desired to enter the

U.S. market by purchasing a company with a proven track record, schemed with three

employees of Advantus Capital Management, Inc. ("Advantus") in an attempt to buy

Advantus away from its parent company Securian Financial Group, Inc.  *Minnesota Life*

*Ins. Co. v. AXA Inv. MGR.*, Civ. 03-4383**,** 2005 WL 1475336, at *1-2 (D. Minn. June 22,

2005).  Although Advantus refused the deal offered by AXA, AXA decided to hire the

13

three employees it had negotiated with.  *Id*. at *2-3.  Three weeks before the three employees resigned from Advantus, AXA issued a press release introducing the Advantus employees and describing the employees' success while at Advantus, stating that they had "'produced a consistently strong track record of performance'" and "'have demonstrated a proven ability and track record.'"  *Id*. at *5.  The court held that these statements were "literally false insofar as they *suggest* to potential customers that the former [employer's] employees were solely responsible for the performance of [their former employer's] fixed income division."  *Minnesota Life Ins. Co.*, 2005 WL 1475336, at *6 (emphasis added) (granting plaintiffs injunctive relief and partial summary judgment).

        As in *Minnesota Life*, Deutsche's press releases, form letter to clients, trade press publication and direct statements to clients send a false message to clients and potential clients.  In *Minnesota Life*, the literal falsity arose from the suggestion that the raided employees were solely responsible for the financial performance of the former employer.  Here, the literal falsity arises from the suggestion that a Deutsche fixed income business is fully operational in Louisville and that the Kentucky Defendants will be ready to service their needs imminently, when in fact all four Kentucky Defendants had committed in writing to remaining employed by INVESCO, no leadership was in place to manage the team of lower level employees arriving from INVESCO, and Deutsche did not yet have an operation up and running in Louisville.  Having pled all this, the question of whether Deutsche's press releases are false or misleading becomes one of factual

proof, not pleading.  *See S&C Rest. Corp. v. Sofia's Diner Rest., Inc.*, Civ. 98-5972, 1999

U.S. Dist. LEXIS 12630 *9-10 (E.D. Pa Aug. 18, 1999).[3]

Deutsche can not seriously dispute that its false statements relate to the nature,

qualities or characteristics of services offered by it and INVESCO.  In the financial

services business, the products or services offered are human capital, *i.e.*, the knowledge,

skills and experience of the individuals managing the funds and investments, and

advertising necessarily focuses on the company's investment professionals and their

qualifications.  *See Riggs Inv. Mgmt. Corp. v. Columbia Inv. Partners*, 966 F.Supp. 1250,

1274 (D.D.C. 1997) (describing the central role played by investment managers in the

financial services businesses); *Minnesota Life Ins. Co.*, 2005 U.S. Dist. LEXIS 12320 at

*8, 15-19.  In *Riggs* the court held that advertisements made by a new investment

company formed by the former chairman of another firm were literally false for purposes

of the Lanham Act because they touted the performance record of the previous firm

"without properly indicating how [the record] was achieved, intending to give the

impression that there was no difference" between the previous firm and the new

company.  *See Riggs Inv. Mgmt. Corp.,* 966 F. Supp. at 1267-8.  Here, Deutsche is

likewise trying to gain an improper competitive advantage by attempting to create the

impression that the services offered by INVESCO (and the Kentucky Defendants) are

now (or imminently will be) offered by Deutsche.

The false statements made by Deutsche, whether considered literally false or

implicitly false, go to the heart of both INVESCO's and Deutsche's services, which

---

[3] Deutsche cannot rely on *Gmurzynska v. Hutton*, 257 F. Supp.2d 621, 631 (S.D.N.Y. 2003), *aff'd* 355 F.3d 206 (2d. Cir. 2004) for the proposition that INVESCO's claim fails because there is no single statement in either press release that is literally false.  Deutsche's Memorandum at 7.  The plaintiff in *Gmurnyska* did not allege that the defendant made any actual false statements, only that the defendant was supposedly behind the statements made by certain other defendants.  *Id.*

INVESCO has specifically alleged in its Amended Complaint.  *See* Am. Compl., ¶¶ 11, 14, 24-6, 28-31.  The presence (or absence) of the Kentucky Defendants and the level of their involvement and business unit leadership is an inherent quality and characteristic of services offered by INVESCO and Deutsche.  The fact that, at the time of the press releases, the Kentucky Defendants had vowed to continue to work for an additional twelve months for INVESCO make the statements in the press releases literally false on a material issue.  The representations contained in the form letter, trade press publication and direct communications with clients also misrepresent the nature of the investment services offered by Deutsche and INVESCO, and therefore are also literally false on a material issue.  *See Minnesota Life Ins. Co.*, 2005 U.S. Dist. LEXIS 12320 at 18.

> 2.   Deutsche's Statements Also Conveyed a False Impression, Are
>        Misleading in Context, and Are Likely to Deceive Consumers

In addition to being factually untrue, Deutsche's press releases and other representations conveyed a false impression, were misleading, and likely deceived clients.  *See Lipton*, 71 F.3d at 474.  False statements actionable under Section 43(a) of the Lanham Act include statements "that may be literally true or ambiguous but which implicitly convey a false impression, are misleading in context, or are likely to deceive consumers."  *Minnesota Life Ins. Co.*, 2005 U.S. Dist. LEXIS 12320, at 14-15 (citing *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1180 (8th Cir. 1998).  In a leading Lanham Act case, the Second Circuit confirmed that § 43(a) is not confined to literal falsehoods:

> That Section 43(a) of the Lanham Act encompasses more than literal falsehoods
> cannot be questioned. … Were it otherwise, clever use of innuendo, indirect
> intimations, and ambiguous suggestions could shield the advertisement from
> scrutiny precisely when protection against such sophisticated deception is most
> needed.

*American Home Prods. Corp. v. Johnson & Johnson*, 577 F.2d 160, 165 (2d Cir. 1978). In *American Home Products*, the court addressed statements that were "*literally true and grammatically correct [but] nevertheless ha[d] a tendency to mislead, confuse or deceive.*" *Id.* (internal citations omitted, emphasis in the original).  Rather, a television commercial and printed advertisement promoting a brand of aspirin was merely "ambiguous," in view of references to "pain" and body sensation accompanying assertions that the advertiser's product reduced inflammation.  *Id.* at 166.  Importantly, the Second Circuit expressly allowed *deliberate ambiguity* which had arisen by innuendo into the ambit of the Lanham Act's Section 43(a).  *Id.* at 166-7.  The Second Circuit concluded that an injunction was appropriate to ensure that defendant engaged in no further deceptive advertising.

As Judge Sprizzo more recently observed: "The bottom line is that a statement, although literally true, can for all practical purposes, convey a false message." *Johnson & Johnson-Merck Consumer Pharms Co. v. Procter & Gamble Co.*, 285 F. Supp. 2d 389, 392 (S.D.N.Y. 2003), *aff'd*, 90 Fed. Appx. 8 (2d Cir. 2003).  In *Johnson & Johnson*, the plaintiff alleged that Procter & Gamble's advertisement for heartburn medication violated the Lanham Act through the claim that one pill provided 24-hour relief, when the medication did not take effect until five hours after ingestion.  The court concluded that "P & G's advertisements fit well within that definition and well within the category of falsity by necessary implication or, under the common law phraseology, of a <u>half-truth</u>." *Id.* at 392 (emphasis added).

This case, at best, reflects Deutsche's clever and deliberate use of ambiguity in press releases and other publications that leaves a clear impression on clients that the

pilfered employees, particularly the leaders of the group, are set up and ready to conduct business on behalf of Deutsche or will be ready imminently.  Particularly in mentioning the Kentucky Defendants in the same sentence as the second-tier employees already at Deutsche, the press releases contain purposeful ambiguity and half-truths as to the arrival of the new fixed income team in Louisville, which was designed to cause (and will be shown to have had the effect of causing) clients and potential clients to believe that they could immediately move their business to an installed Deutsche Bank business with a full leadership team in place.[4]

Notably, the *Johnson & Johnson* court observed that, had the advertisements "been differently worded. . . even by the simple addition of 'one pill per day provides relief for 24 hours,' this case would be very different."  *Id.* at 393.  The court concluded that "P & G chose its language and now must live with the consequences."  *Id.*  Likewise, Deutsche could have easily avoided what is, at best, a deliberate ambiguity with the inclusion of just a few words, *e.g.*, "in one year's time."   It purposely chose not to, and it must now bear the legal consequences of its decision.

Deutsche's argument that its representations are not actionable because they contain only immaterial omissions is untenable.  *See* Deutsche Memorandum at 8-12. Deutsche relies primarily on *Truck Components, Inc. v. K-H Corp.*, 776 F. Supp. 405 (N.D. Ill. 1991), where the disputed press releases touted that the defendant was entering into a line of business (manufacture of certain truck parts), which the plaintiff contended

---

[4] It is ironic that Deutsche argues that the one reference to the arrival of the twelve second-tier INVESCO employees somehow renders the March 26 press release accurate.  To the contrary, it was likely known to many clients and potential clients that these twelve employees had already started work for Deutsche or were going to do so by the end of the week.  *See* Am. Compl. Ex. I.  By associating the arrival of the four Kentucky Defendants with that of the twelve second-tier employees, Deutsche clearly hoped to cause clients to believe that the Kentucky Defendants were on the same or a similar timetable as their direct reports.

was prohibited by a non-competition agreement.  The plaintiff argued that its competitor's failure to disclose that its conduct violated the terms of the non-competition agreement rendered the releases false and deceptive.  The court rejected this argument, holding that the omission did not relate to the "nature, characteristics, qualities or geographic origin" of the goods sold.  *Id.* at 410.

The holding of *Truck Components* is inapposite because INVESCO has properly alleged that Deutsche's representations were false, and that the misrepresentations go to the "characteristic, capabilities and qualities" of the services offered by Deutsche and INVESCO.  *See* Am. Compl. ¶ 11, 14, 24-6, 28-31.  The *Truck Components* court reasoned that the dispute over the interpretation of the non-competition term did not pertain to the goods and services offered, *i.e.*, truck parts.  Here, Deutsche's misrepresentations pertain directly to the nature of the services Deutsche and INVESCO offer.  In the institutional fixed income business (as in other financial service businesses), clients are paying for the skills and experience of the investment professional they work with, and Deutsche knew that the best way to promote and sell the services they intended to offer was by deceptively trumpeting the arrival of professionals INVESCO's clients (and Deutsche's potential clients) had worked with in the past.

Deutsche's argument that its false representations are not actionable because they simply expressed "opinion of a possible future event" is meritless.  *See* Deutsche Memorandum at 7.  In the case Deutsche relies on, *Randa Corp. v. Mulberry Thai Silk, Inc.,* 00 Civ. 4061 (LAP), 2000 U.S. Dist. LEXIS 17104 (S.D.N.Y. Nov. 22, 2000), it was clear that the statement at issue constituted nothing more than "puffery" and speculation about a future event that could not be predicted with certainty:

> The allegedly offending passage states that: '[Mulberry] would predict that the current licensee's recent acquisition of Regis Philbin Neckwear will cause a revenue loss to Geoffrey Beene Neckwear of up to 30% in department store sales.' (Compl.Ex. A.) Mulberry's statement is an opinion of a possible future event.  It is a prediction about a possible business trend.  At most, it is mere puffery.

*Id.* at *10.  Unlike in *Randa*, there was no uncertainty about the future at the time the offending press releases and form letters were published.  The four Kentucky Defendants and their London colleague had each committed to staying at INVESCO for many more months.  Deutsche's statements were not simply overly optimistic predictions or transparent puffery; they were indisputably false and misleading.[5]

Finally, INVESCO's reliance on *Global Discount Travel Services, LLC v. Trans-World Airlines, Inc.*, 960 F. Supp. 701 (S.D.N.Y. 1997) is also misplaced.  In *Global Discount*, the falsity of the statement at issue turned on the plaintiff's contention that the defendant had breached the contract at issue in the case.  As the court observed, "[i]n the absence of a clear and unambiguous determination of the contractual rights and liabilities of the parties . . . defendant's statements simply expressed an opinion – not a false statement – about the legal effect of its contracts."  *Id.* at 706-07 (footnote omitted).  In this case, determination of falsity does not turn on any party's interpretation of a contract or other legal document or principle.  The falsity of Deutsche's statements can be shown by reference to the notices sent by each of the four Kentucky defendants on March 26 – facts that are simply not disputed by anyone.

Deutsche's Motion to Dismiss should be denied because INVESCO's Amended Complaint is well-pled and includes factual allegations to support each element of a Section 43(a) claim.

---

[5] Of course, the false information provided by Deutsche for inclusion in the *Pensions & Investments* article did not include either a prediction or opinion; instead, it flatly misrepresented the current state of affairs.

C.    The Court Should Retain Supplemental Jurisdiction Over the State Law Causes of Action to Further the Interests of Judicial Economy, Convenience and Fairness

Even if INVESCO's Lanham Act claim were dismissed, this Court should exercise supplemental jurisdiction over the remainder of the claims.  The Second Circuit has held that, even after dismissal of the federal law claims upon which jurisdiction had been premised, a district court can exercise discretion to retain jurisdiction over the remaining causes of action under 28 U.S.C. § 1367(c) (3), based upon a "weigh[ing] and balanc[ing of] several factors, including considerations of judicial economy, convenience and fairness to litigants." *Purgress v. Sharrock*, 33 F.3d 134, 138 (2d Cir. 1994) (affirming the district court's decision to retain jurisdiction over state law claims after the federal court claims had been dismissed); *see also Enercomp, Inc. v. McCorhill Publ'g, Inc.*, 873 F.2d 536, 545 (2d Cir. 1989) (affirming the district court's exercise of pendent jurisdiction, and stressing that dismissal of claims under federal law "does not automatically mandate dismissal of pendent state claims"); *Philatelic Found. v. Kaplan,* 647 F. Supp. 1344, 1348 (S.D.N.Y. 1986) (exercising pendent jurisdiction after granting motion to dismiss federal claim); *Ackerman v. National Prop. Analysts, Inc.*, 887 F. Supp. 494 (S.D.N.Y. 1992) (retaining jurisdiction over state law causes of action after dismissal of federal law causes of action).

The Court should retain jurisdiction in this case in the interest of fairness to the parties, convenience and judicial economy.  Sending this case back to state court would feed directly into Deutsche's "divide-and-conquer" strategy.  If INVESCO is required to re-file its state law claims in a new lawsuit in a New York or Kentucky court, there will be no basis for federal jurisdiction, foreclosing the most obvious path to ensuring that this unitary dispute is heard and decided in a single jurisdiction.  Litigation of this dispute in

multiple forums undermines the interests of convenience and judicial economy, threatening redundant proceedings (such as the preliminary injunction hearing) and inconsistent results in different courts.

As this Court has already observed, this case should be adjudicated in one forum, and the most convenient forum is the Kentucky Court. Judge Russell and Magistrate Judge Whalin, who are overseeing the case pending in the Kentucky Court, have already invested significantly in the Kentucky Defendants' case, and they are thus well-positioned to oversee this case as well. INVESCO has endeavored to cooperate with Deutsche to achieve a consensual transfer of the case to Kentucky but has been rebuffed at every turn. Dismissal of the claims at issue in this case will frustrate INVESCO's efforts to transfer this case to the Kentucky Court. The interests embodied in Section 1367 will thus be furthered by the Court exercising discretion to retain jurisdiction over the supplemental state law claims in this case.

These same interests are also served by the Court retaining jurisdiction over INVESCO's state law claims upon denial of Deutsche's Motion to Dismiss the Lanham Act claim.[6] Where a federal law cause of action has been validly stated, 28 U.S.C. 1367(c)(2) permits dismissal of supplemental state law causes of action only if the supplemental claims "*substantially* predominate" over the federal law claim (emphasis added). Second Circuit courts have made clear that supplemental claims can be dismissed under 28 U.S.C. 1367(c)(2) only where the substantial predomination standard has indisputably been satisfied. *See Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 140 F.3d 442, 446 (2d Cir. 1998) (the "'substantially predominates' standard of §

---

[6] Deutsche apparently does not believe Section 1367(c)(2) has any application in this case, since it has not argued for dismissal on that basis. INVESCO is addressing this issue to address the Court's reference to this section of the statute at the May 4, 2007 oral argument on INVESCO's Motion to Transfer.

1367(c)(2) creates a 'limited exception' to the exercise of supplemental jurisdiction that should be invoked only when 'permitting litigation of all claims in the district court can accurately be described as allowing a federal tail to wag what is in substance a state dog.'");  *Luongo v. Nationwide Mutual Ins. Co.*, No. 95-3190, 1996 WL 445365, at *5 (S.D.N.Y. Aug. 7, 1996) (quoting *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 789 (3d Cir. 1995)); *U.S. Fire Ins. Co. v. United Limousine Serv., Inc.*, 328 F. Supp. 2d 450, 453 (S.D.N.Y. 2004) ("the Second Circuit has held that § 1367 does more than merely *permit* district courts to hear supplemental claims; it, in fact, *requires* them to do so") (emphasis in original).

Section 1367(c)(2) cannot be invoked in this case because INVESCO's state law claims do not substantially predominate over the federal law claim. Deutsche's misleading promotional campaign is an integral part of its raid on INVESCO and its scheme to destroy INVESCO's fixed income investment business.  The deceptive campaign is by no means a peripheral matter and will require much of the same evidentiary proof as the state claims.  *See e.g., Dunlop v. City of New York*, No. 06-CV-433, 2006 WL 2853972, at *6 (S.D.N.Y. Oct 04, 2006) (plaintiff's state law claims did not predominate under Section 1367(c) because (1) the federal claims required much of the same proof as the state claims, (2) the federal claims were not merely peripheral to the state claims, and (3) all of plaintiff's claims arose out of a series of events that were interrelated).

The conduct underpinning INVESCO's Lanham Act claim is interrelated with and forms a part of the same overall scheme giving rise to its state law claims.  *See SST Global Tech., LLC v. Chapman*, 270 F. Supp. 444, 458-59 (S.D.N.Y. 2003) (state law

claims did not substantially predominate over federal claim where there was a "substantial interplay" between the federal claim and the state law claims).  Much of the evidence in the case thus bears on both INVESCO's Lanham Act and state law causes of action.  For example, the resignation notices delivered on March 26 (and evidence of Deutsche's involvement therein) are relevant both to Deutsche's tortious interference and Lanham Act claims.  Likewise, evidence of Deutsche's planning of the initial wave of resignations on March 26 will necessarily overlap with evidence of its planning of the publicity campaign launched on that same date, which was designed to induce further employee resignations and client defections.

Even if the state law claims could be said to substantially predominate over the federal law claim (which they do not), Section § 1367(c)(2) "does not divest the Court of supplemental jurisdiction; rather, it gives the Court discretion to decline to exercise the jurisdiction provided by §1367(a)."  *Chan v. Triple 8 Palace*, No. 03-6048, 2004 WL 1161299, at *3 (S.D.N.Y. May 24, 2004).  For the reasons set forth above, the Court should, in its discretion, exercise supplemental jurisdiction over the state law claims, to ensure that all claims involving all parties in this dispute can be heard only one time in a single forum.

.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, INVESCO respectfully requests that the Court deny

Deutsche's Motion to Dismiss.

Dated:     New York, New York
           May 9, 2007




                                             ALSTON & BIRD LLP


                                             By:  <u>s/ John F. Cambria_____</u>
                                             John F. Cambria (JC 4098)
                                             Michael E. Johnson (MJ 0299)
                                             Piret Loone (PL 6597)
                                             90 Park Avenue
                                             New York, NY 10016-1387 212-
                                             210-9400

                                             *Attorneys for Plaintiff*
                                             *INVESCO Institutional (NA.), Inc*


<u>Of counsel:</u>

Robert P. Riordan
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA  30309-3424
Phone:  (404) 881-7000